**EXHIBIT A**

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

```
 1                  UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.H. and H.H., in each case a minor,  )
     by and through their guardian ad      )
 5   litem Crystal Hanson, individually    )
     and as successor in interest to Shane )
 6   Holland, deceased; C.H., a minor by   )
     and through her guardian ad litem,    )
 7   Reymi Updike; individually and as     )
     successor in interest to Shane        )
 8   Holland, deceased, and PATRICIA       )
     HOLLAND, individually,                )
 9                                         )
                   Plaintiffs,             )
10                                         )
                   vs.                     )Case No.
11                                         )5:23-CV-01028-JGB-SHK
     COUNTY OF SAN BERNARDINO; JUSTIN      )
12   LOPEZ, DOES 1-10, inclusive,          )
                                           )
13                 Defendants.             )
     _____)

14

15

16

17           REMOTE VIDEOCONFERENCE DEPOSITION OF

18                       JUSTIN LOPEZ

19                   FRIDAY, APRIL 11, 2024

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  62323
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 2

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4   A.H. and H.H., in each case a minor,  )
    by and through their guardian ad      )
5   litem Crystal Hanson, individually    )
    and as successor in interest to Shane )
6   Holland, deceased; C.H., a minor by   )
    and through her guardian ad litem,    )
7   Reymi Updike; individually and as     )
    successor in interest to Shane        )
8   Holland, deceased, and PATRICIA       )
    HOLLAND, individually,                )
9                                         )
                 Plaintiffs,              )
10                                        )
                 vs.                      )Case No.
11                                        )5:23-CV-01028-JGB-SHK
    COUNTY OF SAN BERNARDINO; JUSTIN      )
12  LOPEZ, DOES 1-10, inclusive,          )
                                          )
13               Defendants.              )
    _____)

14

15

16

17          The remote videoconference deposition of JUSTIN

18  LOPEZ, taken on behalf of the Plaintiffs, beginning at 10:04

19  a.m., and ending at 12:05 p.m., on Friday, April 11, 2024,

20  before Jinna Grace Kim, Certified Stenographic Shorthand

21  Reporter No. 14151.

22

23

24

25

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 3

```
 1    APPEARANCES OF COUNSEL:

 2
      For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:  DALE K. GALIPO, ESQ.
              BY:  RENEE V. MASONGSONG, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  rvalentine@galipolaw.com
 8

 9    For the Defendants:

10            MANNING & KASS ELLROD, RAMIREZ, TRESTER, LLP
              BY:  KAYLEIGH ANDERSEN, ESQ.
11            801 South Figueroa Street, 15th Floor
              Los Angeles, California 90017
12            Tel:  213-624-6900
              E-mail:  kaa@manningllp.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 8

```
 1      A.   Based -- so after the incident it was found that

 2   Shane Holland didn't have a firearm.  So it was the lethal

 3   force encounter of our officer-involved shooting suspect who

 4   was unarmed.

 5           So that's why the DOJ got involved.

 6      Q.   Did you inform the DOJ whether or not you were

 7   willing to give a statement?

 8      A.   My lawyer did.

 9      Q.   Who was your lawyer, if you recall?

10      A.   I'm drawing a blank on his name right now, sir.

11      Q.   That's okay.  We're easily forgettable.

12           I get it.  But was it your understanding that your

13   lawyer declined for you to give a statement?

14      A.   Yes, sir.

15      Q.   So is this the first time since the incident you're

16   giving me a formal statement?

17      A.   Yes, sir.

18      Q.   What was the date of the incident?

19      A.   I do not recall the specific date.

20      Q.   Do you recall the month or the year?

21      A.   It was June of 2022.

22      Q.   Do you know about what time it happened?

23      A.   I know it was early morning hours around 2 or 3

24   o'clock in the morning.

25      Q.   Obviously, it would have been dark outside?
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 12

1   six months later.

2      Q.   And then after that did your assignment change?

3      A.   Yes, sir.

4      Q.   And how so?

5      A.   I was assigned to be patrol deputy at the Victor

6   Valley Station.

7      Q.   And did you have a period of field training for

8   that?

9      A.   Yes, sir.

10     Q.   How long was the field training, approximately?

11     A.   Approximately 16 weeks, I believe.

12     Q.   And when did your field training for patrol end,

13  approximately?

14     A.   I want to say it was August of 2020.

15          I might have my math wrong.

16     Q.   Is that an approximation?

17     A.   Yes, sir.

18     Q.   And so how long do you think you've been -- we're

19  out of field training when our shooting incident that we're

20  hear about occurred?

21     A.   I want to say about three years.

22     Q.   You fired some shots in this incident; is that

23  correct?

24     A.   Yes, sir.

25     Q.   How many shots did you fire?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

1        A.    Six.

2        Q.    What type of weapon did you fire the shots from?

3        A.    Glock 21, a 45-caliber.

4        Q.    And you were aiming at Mr. Holland?

5        A.    Yes, sir.

6        Q.    What portion of his body were you aiming at?

7              Would it have been center mass from your

8    perspective?

9        A.    Yes, sir.  His upper thoracic area.

10       Q.    When you fired your shots were you stationary or

11   moving?

12       A.    I was moving.

13       Q.    Did you have your gun in one hand or two?

14       A.    Two hands.

15       Q.    What would you estimate the distance to be between

16   you and Mr. Holland when you fired your first shot?

17       A.    No more than ten yards.

18       Q.    You played some football, so when you say ten yards,

19   you're approximating like 30 feet or less?

20       A.    Correct.

21       Q.    So are you saying you think you were within 30 feet

22   from him when you fired your first shot?

23       A.    Yes, sir.

24       Q.    Did the distance between you and Mr. Holland change

25   at all during the shooting sequence?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 14

```
 1      A.   Yes, sir.

 2      Q.   How so?

 3      A.   I was -- I continued advancing on Holland while I

 4   was shooting, and I might have closed the gap five to ten

 5   feet in the process.

 6      Q.   So by the time of the last shot, it might have been

 7   20 or 25 feet in between you?

 8      A.   Approximately.

 9      Q.   Prior to your first shot did you ever specifically

10   identify a gun in his hand?

11      A.   Never specifically a gun, no, sir.

12      Q.   Did you ever specifically identify a gun anywhere on

13   his person before you fired the first shot?

14      A.   No, sir.

15      Q.   I'll make it broader.

16           Is it a fair statement that you never identified a

17   gun in his hand or on his person at any time before or during

18   the shooting?

19      A.   No, sir.  I never positively identified a gun.

20           I saw what I believe may have been a gun.

21      Q.   I take it a gun, you have some familiarity with

22   guns?

23      A.   Yes, sir.

24      Q.   And your gun, for example, has various parts to

25   it?
```

Case 5:23-cv-01028-JGB-SHK   Document 35-3   Filed 08/12/24   Page 9 of 47   Page ID #:337

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 15

1    A.   Correct.

2    Q.   And I know I'm not going to name all the parts, but

3  for example, it has a barrel, a grip, trigger, trigger guard,

4  things of that nature?

5    A.   Yes, sir.

6    Q.   Did you identify any specific parts of a gun --

7    A.   No, sir.  Sorry I didn't mean to cut you off.

8    Q.   That's okay.  You already knew what I was going to

9  ask, but remember, we have to have a slight pause for our

10  court reporter.

11    A.   I'll do that.

12    Q.   So just to make sure I'm understanding what you're

13  saying, you never identified any specific parts of the gun in

14  any objects on Mr. Holland; is that correct?

15    A.   Correct.

16    Q.   Do you recall after the shooting, another officer

17  arriving near where you were at?

18    A.   Yes, sir.

19    Q.   Do you know who that officer was?

20    A.   It was Deputy Hillibrand.

21    Q.   And when you listened to the audio of the incident

22  after the shooting, did you hear some of the conversation

23  between you and that deputy?

24    A.   Yes, sir.

25    Q.   Do you recall the deputy asking you whether there

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 16

```
1    was a gun, or words to that effect?

2         A.   Yes, sir.

3         Q.   And do you recall what your response was to him?

4         A.   Yeah.  I advised him I didn't know where the gun

5    was, and he said that he had one.

6         Q.   You're saying that you told the deputy you didn't

7    know where the gun was?

8         A.   Correct.

9         Q.   But that he said he had a gun, referring to

10   Mr. Holland?

11        A.   Correct.

12        Q.   Have you ever been provided with a transcript of the

13   audio that led up to the shooting?

14        A.   I saw it in the DOJ report, I believe.

15        Q.   Did Mr. Holland ever specifically tell you he had a

16   gun?

17        A.   No, sir.  He just made statements similar to

18   somebody who would have a gun.

19        Q.   He was saying I will shoot you, or words to that

20   effect?

21        A.   Yes, sir.

22        Q.   But would you at least agree he never specifically

23   said I have a gun?

24        A.   I would agree.

25        Q.   Do you recall when the deputy asked, "Where is the
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 17

1    gun, do we have a gun," you saying, "I don't know?"

2         A.   Yes, sir.

3         Q.   Okay.  So let's go back to the beginning of this

4    incident.

5              Did something initially draw your attention to a

6    vehicle involved in this incident?

7         A.   Yes, sir.

8         Q.   And what drew your attention?

9         A.   I was -- so I was -- I was driving towards the

10   County pumps and was coming to the end of my shift, and I saw

11   a vehicle that didn't have a license plate.

12             So I initiated a traffic stop based on the belief

13   there was no license plate on it.  The vehicle yielded, and

14   when I exited the vehicle, I found out that it did have a

15   license plate.  It was just not mounted where license plates

16   are typically mounted.

17             And it didn't have any lighting, and then the

18   reflective coating on the plate was scratched off, so I

19   didn't see the plate initially.

20        Q.   So let me just ask you a few questions about that.

21             It sounds like this happened in the latter part of

22   your shift.

23        A.   Correct.

24        Q.   Were you in a patrol vehicle by yourself?

25        A.   Yes, sir.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 18

1    Q.   And the vehicle that you observed, where was the

2    vehicle when you first observed it?

3    A.   I believe it was on -- it was on US highway 395

4    approximately -- it was just north of a stop at Adelanto Road

5    when I first saw it.

6    Q.   Was it moving or stopped when you first observed

7    it?

8    A.   It was moving in the same direction of travel as I

9    was.

10   Q.   And were you behind it?

11   A.   I don't think initially I was, but I moved behind it

12   to initiate the traffic stop.

13   Q.   What type of vehicle was it, if you recall?

14   A.   I remember being an older model SUV.

15        I read the report.  It's a Ford Explorer.

16        I don't remember the year, though.

17   Q.   It's okay.  Do you recall the color?

18   A.   I remember it was dark in color.

19   Q.   And how far away was it from you when you first

20   observed it?

21   A.   Maybe 100 yards, 200 yards.

22        I don't know.  It's hard to estimate when I first

23   laid eyes on the vehicle on the highway.

24   Q.   Approximately how far were you from the vehicle when

25   you thought it did not have a license plate?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 20

1    testimony and about the plate, and I'm sorry I'm asking some

2    follow-up questions, but because I don't have a statement

3    from you or prior interview, I don't know your thought

4    process.

5              Are you saying that the vehicle ended up having a

6    license plate, but it was in a different spot than you would

7    normally expect it?

8         A.   Yes, sir.

9         Q.   Where was the license plate on the vehicle?

10        A.   It was mounted to the tailgate of the vehicle just

11   below the rear window.

12             I believe it neighbored the driver side.

13        Q.   And when did you notice that it had a license

14   plate?

15        A.   Upon approach.

16        Q.   And when you activated your lights to pull the

17   vehicle over, did it timely pull over?

18        A.   Yes, sir.

19        Q.   Did you call-in the plate of the vehicle?

20        A.   Yes, sir.

21        Q.   And did it come back with any history as far as

22   wants or warrants or stolen or anything like that?

23        A.   No, sir.

24        Q.   Did it indicate, if you recall, who the registered

25   owner of the vehicle was?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 21

```
 1      A.    I do not recall.

 2      Q.    And I'm assuming at some point you approached the

 3   vehicle?

 4      A.    Yes, sir.

 5      Q.    Did you have your flashlight out at the time?

 6      A.    Yes, sir.

 7      Q.    Do you recall if you approached on the driver side

 8   or the passenger side?

 9      A.    The passenger side.

10      Q.    And at some point did you attempt to illuminate the

11   inside of the vehicle?

12      A.    Yes, sir.

13      Q.    Could you tell at that point how many occupants were

14   in the vehicle?

15      A.    Yes, sir.

16      Q.    How many were in the vehicle?

17      A.    Two, sir.

18      Q.    And where were they seated, if you recall?

19      A.    The driver seat and the front passenger seat.

20      Q.    And the person you shot is Mr. Holland; is that

21   correct?

22      A.    Yes, sir.

23      Q.    Where was Mr. Holland seated in the vehicle?

24      A.    He was on the passenger seat.

25      Q.    That would be the front passenger seat?
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 22

```
1        A.   Correct.

2        Q.   Do you recall if the driver's -- strike that.

3             The passenger side door or window ever became open

4   during the time you were on the passenger side of the

5   vehicle?

6             Like they opened the door or they lowered the

7   window?

8        A.   During my initial approach?

9        Q.   Yes.

10       A.   Yes.  The passenger side window was opened.

11       Q.   What do you recall about that initial

12   conversation?

13       A.   I recall asking the driver if he had his license,

14   and I believe his registration, and he said he did not have

15   his license on him.

16            And I remember asking Mr. Holland for his

17   identification as well.

18       Q.   Why did you ask Mr. Holland for his

19   identification?

20       A.   Because typically, when I make a traffic stop and I

21   believe that I may have to toe the vehicle, I give the

22   occupants the opportunity to provide me with their

23   identification in case I decide to allow them the opportunity

24   to drive the car away.

25       Q.   Now, in there case, though, you've already seen that
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 23

1   it had a license plate when you approached?

2       A.   Correct.

3       Q.   Were you intending to tow the vehicle at that

4   point?

5       A.   No.  I don't -- I don't remember what the

6   registration came back as.  So I don't -- I just -- that's my

7   standard practice when I identify people.

8            I don't know what the criminal investigation is

9   going to uncover.  And should I have to tow the vehicle, I

10   like to have all my passengers identified.

11           That way I can make the determination as to whether

12   or not somebody else would be able to drive the vehicle

13   away.

14      Q.   And did Mr. Holland provide you with his ID or

15   information?

16      A.   He provided me with name and birthday.

17      Q.   Anything else you recall about the initial

18   conversation between you and the occupants of the vehicle?

19      A.   Yes, sir.  I noticed that Shane -- I'm sorry --

20   yeah, Holland, I noticed that Holland was extremely nervous.

21   He was very jittery, and he was tapping his hands on his lap.

22   He was sweaty which is kind of weird for the time of night

23   and the temperature it was.

24           And to me it just kind of -- he was giving me --

25   based on my training and experience and the interactions I've

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 26

1     Q.   After you got the information on the passenger side

2   of the car, did you stay in that area, or did you tactically

3   reposition more towards your vehicle for a short time?

4     A.   Once I gathered the information from both the driver

5   and the passenger, I walked back to my patrol vehicle, and I

6   patrol vehicle's radio to run the two people over the air

7   while standing behind the passenger door.

8     Q.   Did either of the occupants verbally or physically

9   threaten to harm you while they were in the car and you were

10   on the side?

11     A.   No.

12     Q.   Did anybody say that they had a gun or anything like

13   that while you were on the side?

14     A.   No, sir.

15     Q.   Did you notice any cell phones in the car at that

16   point?

17     A.   No, sir.

18     Q.   And did you actually go back in your car, or were

19   you standing close to the car when you were calling-in the

20   information?

21     A.   I was standing close to the car.

22     Q.   Would that be on the driver side?

23     A.   No.  The passenger side.

24     Q.   And were either one of your spotlights illuminating

25   their vehicle, if you recall?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 27

```
 1      A.   I believe I used all of my lights on my vehicle.

 2      Q.   And was their vehicle on the shoulder of the road at

 3   that point?

 4      A.   Yes, sir.

 5      Q.   And then at some point did you observe Mr. Holland

 6   getting out of the vehicle?

 7      A.   Yes, sir.

 8      Q.   And were you on the passenger side of your vehicle

 9   when he got out?

10      A.   Yes, sir.

11      Q.   Had you received any of the information back yet

12   regarding the individuals in the car?

13      A.   No.

14      Q.   Did you have a chance to call the information in?

15      A.   I had a chance to -- are you -- are you speaking of

16   being able to relay the information provided me to dispatch?

17      Q.   Yes, exactly.

18      A.   Yes.  I was able to give both names and birthdays

19   provided to me.

20      Q.   So you were able to do that before Mr. Holland got

21   out?

22      A.   Correct.

23      Q.   But you didn't get any information back before he

24   got out; is that fair?

25      A.   That's correct.
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 28

1    Q.   And did you actually observe Mr. Holland getting out
2    of the car?

3    A.   Yes, sir.

4    Q.   And when he got out of the car, how far away were
5    you from him, approximately?

6    A.   I was aware the vehicle -- my vehicle's parked.

7         So again, approximately a vehicle length away, and
8    then, you know, a few feet back to account for that space
9    between the front of the car and the passenger door.

10   Q.   And was the lights from your vehicle illuminating
11   Mr. Holland when he got out of the car?

12   A.   Yes, sir.

13   Q.   Did he say anything to you when he got out of the
14   car?

15   A.   No, sir.

16   Q.   Did you see any gun in his hand or on his person
17   when he got out?

18   A.   No.  I saw -- I saw him side-step around the door
19   he had opened and continue facing away from me, and his hands
20   were positioned in front of him as if he was holding onto his
21   waistband or waistband area.

22   Q.   Could you actually see his hands at that point?

23   A.   No, sir.

24   Q.   Could you actually see his hands in contact with his
25   waistband?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 31

1  BY MR. GALIPO:

2      Q.  And I just want this as a visual, when Mr. Holland

3  got out of the vehicle, did he start moving or running away

4  from you at some point?

5      A.  Yes, sir.

6      Q.  And did you follow him to the best of your

7  ability?

8      A.  Can you clarify your question?

9      Q.  Yeah.  Did you run after him?

10     A.  Yes, sir.

11     Q.  Which general direction did he run?

12     A.  He ran south on 395, initially.

13     Q.  So like on the shoulder of the road, initially?

14     A.  Correct.

15     Q.  And for how long approximately did he run on the

16  shoulder of the road going southbound?

17     A.  If you could see that conex [phonetic] box

18  approximately to that area before he started heading west.

19     Q.  So to go west, that would be to the -- he would go

20  to his right from going south; he would turn to his right?

21     A.  Correct.

22     Q.  Now, I know at some point, and I know he said it

23  more than once, words to the effect, "I'm going to shoot

24  you."

25         Did you hear that when he said that?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 32

```
1       A.   Yes, sir.

2       Q.   When he first said that, was he running still

3   southbound on the shoulder, or he had already moved in a

4   westerly direction?

5       A.   I believe when he started saying that, we were at

6   already started heading west.

7       Q.   And then in which direction did you head west?

8            Can you describe it just looking at this, or you

9   know, using Cactus or anything else?

10           You know, I wish I can have you draw on the screen.

11           I think there is a way for you to do that, but I'm

12   not sure how to do it.

13           MR. GALIPO:  Renee, do you know how we could do

14   that?

15           Apparently not.

16   BY MR. GALIPO:

17       Q.   Anyway, describe it the best you can.

18       A.   The foot pursuit?

19       Q.   Yes.  I'm trying to get an idea.  I got it that he's

20   running on the shoulder southbound for some distance before

21   he turns in a westerly direction; is that part correct?

22       A.   Correct.  It wasn't --

23       Q.   And then --

24       A.   I'm sorry.  Go ahead.

25       Q.   No.  Go ahead.
```

A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Justin Lopez on 04/11/2024

Page 33

1      A.   It wasn't in a like a 90-degree turn kind of
2   fashion.  It was more of a gradual turn to the westbound
3   point of direction.

4      Q.   And in looking at anything in this image, could you
5   see approximately where he was when he started to turn in a
6   westerly direction?

7      A.   Again, it was around the corner.  So where that
8   conex box was I believe he cut through that dirt field.

9           He wasn't necessarily running straight at all.

10          He was zigzagging in his motion.  So he was very
11  unpredictable as to where he was going.

12     Q.   And where was he approximately when he first said,
13  "I will shoot you," or words to that effect?

14     A.   If I had to give you an approximation, I would say
15  maybe 30 yards, 40 yards from the corner of 395 and Cactus.

16          And that would be --

17     Q.   And once he --

18     A.   Sorry.

19     Q.   Sorry.  Go ahead.

20     A.   I said that would we the northwest corner of 395 and
21  Cactus.

22     Q.   Was he running away from you when he initially said,
23  "I will shoot you?"

24     A.   Yes, sir.

25     Q.   And he said it more than once; is that fair?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 34

```
 1      A.   Correct.

 2      Q.   Do you have an approximation as to how many times he

 3   said that?

 4      A.   I would -- I believe it was approximately around ten

 5   times.

 6      Q.   And how far do you think he ran from the time he

 7   said it the first time to the time he said it the last

 8   time?

 9      A.   It's really hard to give an estimation with time and

10   space, but maybe 60 to 80 yards, somewhere around there.

11      Q.   And was he running generally in a westerly direction

12   during all the times he said, "I'll shoot you?"

13      A.   Yes.

14      Q.   And where was he approximately, looking at this

15   photo, the last time he said, "I will shoot you?"

16      A.   The last time he said it?

17      Q.   Yes.

18      A.   I would say the general vicinity of that left-hand

19   turn lane on Cactus, but closer to the shoulder, yes.

20           On the bottom of the screen you have that left-hand

21   turn lane, it was probably around that area closer to the

22   shoulder was the last time he said it if my memory serves me

23   correct.

24           MR. GALIPO:  Renee, can you put your cursor towards

25   the bottom?
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 37

1      Q.   I think so.  His back was generally towards you as

2   he was running southbound?

3      A.   When we were running southbound, that's correct.

4      Q.   And how far were you running behind him during that

5   part of the foot pursuit?

6      A.   I maintained the same distance the entire pursuit

7   because of his posturing.

8      Q.   And what was that approximate distance that you

9   maintained during the entire pursuit?

10     A.   Approximately ten yards.

11     Q.   And were you also running on the shoulder during the

12   initial part of the pursuit?

13     A.   I was running in the same direction as him.

14          I was trying to stay behind him, but I was also

15   creating an irregular pattern in my running because he was

16   looking back for me.

17     Q.   You saw him glancing over one of his shoulders

18   various times?

19     A.   Correct.  His left shoulder.

20     Q.   And did you have anything in your hands during this

21   portion of the foot pursuit?

22     A.   I believe when we started heading west on Cactus, he

23   switched his primary hand to the front of his waistband from

24   his left to his right.  And so at that point because he was

25   favoring his left shoulder, I really believed that he might

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 38

1   have a gun, and therefore, I pulled out my gun and turned on

2   my strobe light.

3       Q.   Is that once he started turning west, or is that

4   before that?

5       A.   It would be right around the area he started to head

6   west.

7       Q.   So the initial part of the pursuit when he was going

8   south, did you have anything in your hands at that point?

9       A.   No.  I believe maybe just my flashlight.

10      Q.   Are you right-handed or left-handed?

11      A.   I'm a right-handed person.

12      Q.   Were you illuminating him with your flashlight as

13  you were running after him in the southbound direction?

14      A.   Yes, sir.  Initially.

15      Q.   And during that time did he ever turn towards you

16  with an object in his hands?

17      A.   He had turned towards me, again, with looking over

18  his left shoulder, but he didn't -- I didn't see any objects

19  in his hands because there was always one hand in front of

20  his person.

21      Q.   Did you ever consider tactically maybe not pursuing

22  him on foot given that you were alone and it was another

23  driver in the vehicle?

24      A.   I did consider it, but it was a rapidly-evolving

25  situation, and again, based on his posturing and my initial

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 39

1   contact with him, I thought it would be -- I thought it was a

2   better move to pursue him.

3        Q.   So you considered it, but you thought it would be

4   better to pursue him?

5        A.   Correct.

6        Q.   And so once he turned in a westerly direction,

7   that's about the time you pulled out your firearm?

8        A.   Approximately.

9        Q.   Did he ever say, "I will shoot you" before you

10  pulled out your firearm?

11       A.   I don't recall if I pulled out my firearm when he

12  switched to his right hand or when he said, "I will shoot

13  you" the first time.  But it was one of those two things that

14  really led me to believe he had a gun, and that's when I

15  pulled out my firearm.

16       Q.   Okay.  And then you continued to pursue him, but

17  more in a westerly direction?

18       A.   Correct.

19       Q.   So do you think during that portion of the pursuit,

20  he ever looked over his shoulder and saw you with a gun in

21  your hand?

22            MS. ANDERSEN:  Objection.  To the extent that calls

23  for speculation.

24            You can answer.

25  BY MR. GALIPO:

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 40

1      Q.   Yeah.  If you know.

2      A.   I don't know if he would have had any knowledge of

3   me having a gun, but I had my strobe light on.  So I don't

4   know if he was able to identify me having a gun.

5      Q.   And the strobe light, was that like a tac light on

6   your firearm?

7      A.   Correct.

8      Q.   Was he looking back at you various times when he was

9   running in a west direction?

10     A.   Yes.

11     Q.   And how often was he looking back at you during that

12   time frame?

13     A.   It was pretty often.  I would say every five yards

14   or so, he would change his direction of travel to, you know,

15   a diagonal version of travel to the other opposite end, and

16   he was always looking for me over his left shoulder.  So --

17     Q.   Okay --

18     A.   Sorry.

19     Q.   And do I have it correct that he traveled

20   approximately 60 to 80 yards in a west direction before the

21   shooting occurred?

22     A.   Again, it's an approximation, but yes.

23     Q.   And during that time frame you're estimating that he

24   said, "I will shoot you" or words to that effect

25   approximately ten times?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 41

```
 1      A.   Correct.

 2      Q.   The first time he said it, did you see any weapon in

 3   his hand at that point?

 4      A.   No.

 5      Q.   Did he turn towards you with an object that you

 6   could see at that point?  In other words, did it look like he

 7   was turning towards you to shoot you after he said it the

 8   first time?

 9      A.   No.

10      Q.   And how about the second time, when he said it the

11   second time, could you see an object in his hands, or did it

12   look like he was turning to shoot you?

13      A.   No.

14      Q.   And if I went through each time up to the last time,

15   the third time, the fourth time, the fifth time, the sixth

16   time, the seventh time, the eighth time, the nineth time, and

17   asked you each one of those times whether he turned towards

18   you with an object in his hand and looked like he was going

19   to shoot you at those times, would your answer be the same;

20   no, not those times?

21      A.   Correct.  Up to the nineth time like you had said.

22      Q.   Okay.  So approximately nine times he said, "I'm

23   going to shoot you," and during those times you would at

24   least agree you did to the see an object in his hands, and it

25   did not appear that he was turning to shoot you during those
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 42

1    nine times; is that fair?

2         A.   Yes, sir.

3         Q.   And you were still running after him at about 30

4    feet behind him?

5         A.   Correct.

6         Q.   Now, you were giving him some commands as you were

7    chasing him westbound?

8         A.   Yes, sir.

9         Q.   Do you recall some of the commands you were giving

10   him?

11        A.   Yes, sir.  It was along the lines "let me see your

12   hands," and I believe I told him to get his hands off his

13   waistband as well.

14        Q.   Did you ever give him a verbal warning that you were

15   going to shoot him?

16        A.   I do not believe so.

17        Q.   Up to the last time that he said, "I will shoot

18   you," did you see any object in his hand at all?

19        A.   You're not including the last time?

20        Q.   Up to that time, and then I'll ask you about the

21   last time.

22        A.   Correct, sir.  I did not see anything in his hand up

23   to the last time.

24        Q.   Let's talk about the last time.

25             And I think I asked you before how much time passed

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 44

1    because of his -- because of his continued looking over his

2    shoulder, the last couple of turns were more -- not the last

3    couple turns, but some of the turns towards the end of the

4    incident were more of a bladed stance where he was turning

5    even more.  He was more of turning rather than just a looking

6    over the shoulder.

7         Q.    How many times did he do more of a turning motion

8    rather than just looking over the shoulder motion?

9         A.    Approximately two.

10        Q.    And when he did those, did you see any object in his

11   hand?

12        A.    No.  Except for the last time.

13              The last time would have been the third.

14        Q.    So the movement he made the last time, he had made a

15   similar movement two prior times?

16        A.    Similar, but more exaggerated.

17        Q.    And the last time, did you see some type of an

18   object?

19        A.    Yes.

20        Q.    And where was this object?

21        A.    It was about at waist level, and it was being held

22   his by right hand.  So I was getting his full left-hand side,

23   and I saw the black object at waist level on his right

24   hand.

25        Q.    And you've already told me you did not specifically

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 45

1    identify it as a firearm; correct?

2        A.    Yes, sir.

3        Q.    Did you say, "drop it" or words to that effect?

4        A.    I did not, sir.

5        Q.    Did the object look to you like it could possibly be

6    a cell phone?

7        A.    No.  To me at the time it looked -- I believed it to

8    be a gun because of the circumstances.

9        Q.    I'm just wondering in terms of its shape or size,

10   whether it also looked like a cell phone, possibly.

11       A.    I did not stare at it long enough to positively

12   identify it as a firearm.  I just -- based off the totality

13   of the circumstances and the way he was carrying it, I

14   believed it to be a gun.

15       Q.    How long did you see this object before you fired?

16       A.    The second I saw it coupled with his turning motion

17   towards me, that's when I decided to fire.  So it was no more

18   than a second that object was being presented to me that I

19   decided to shoot.

20       Q.    And when you were firing were you using your

21   sights?

22       A.    Yes, sir.

23       Q.    Could you see where the object was during the time

24   you were firing?

25       A.    No, sir.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 48

1    Q.   Did you ever tell him that he has a gun?

2    A.   Did I tell my partner that he had a gun?

3    Q.   Yeah.  He has a gun, or something, or words to that

4    effect?

5    A.   Yeah.  I reiterated how Holland told me he had a

6    gun.

7    Q.   Well, isn't what you actually said, "He said he's

8    going to shoot me?"

9    A.   Correct, sir.

10   Q.   I know it might be -- you would agree what you said

11   is, "He said he was going to shoot me."

12        You didn't say that Holland told you he had a gun;

13   is that fair?

14   A.   Correct.

15   Q.   And in all fairness, Holland never specifically told

16   you he had a gun; he just said he was going to shoot you.

17   A.   That's correct.  But I saw during the pursuit what I

18   believed to be a gun at the moment of him turning.

19   Q.   Okay.

20        MR. GALIPO:  We've been going for awhile.

21        Thank you, Renee.  We can take this photo down.

22        I think it's a good time for a break.

23        We're making really good progress.

24        So that's good news.

25        Is ten minutes good for everyone?

A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Justin Lopez on 04/11/2024

Page 50

1      Q.    Do you have them now?

2      A.    Yes, sir.

3      Q.    When did you get them, approximately?

4      A.    I believe it was the end of the last year.

5            So around November, December of 2023.

6      Q.    What was the source of the audio that we're

7  listening to regarding the event?

8      A.    It was my department-issued digital audio

9  recorder.

10     Q.    Were you aware it was on during the incident?

11     A.    Yes, sir.  I activated it.

12     Q.    Did you initially have the impression when

13  Mr. Holland was running southbound on the shoulder that he

14  was trying to get away from you?

15           MS. ANDERSEN:  Objection to the extent that calls

16  for speculation.

17           You can answer.

18           THE WITNESS:  Can you re-ask that question, please?

19  BY MR. GALIPO:

20     Q.    Sure.  When Mr. Holland got out of the car and was

21  initially running southbound before we went in an westerly

22  direction, was it your impression that he was trying to run

23  away from you?

24           MS. ANDERSEN:  Same objection.

25           THE WITNESS:  It was my impression, yeah, he was

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 51

 1   trying to evade his detention.

 2   BY MR. GALIPO:

 3       Q.   And when he was running westbound, was it also your

 4   impression that he was trying to get away from you?

 5       A.   Yes, sir.

 6       Q.   Now, the first nine times approximately that he

 7   said, "I will shoot you" or words to that effect, and he

 8   didn't shoot you, and you didn't see a gun or an object, did

 9   you consider in your mind maybe he's just telling me he's

10   going to shoot me so that I'll stop chasing him?

11       A.   That never crossed my mind.

12           MS. ANDERSEN:  A late objection to the extent that

13   calls for speculation.

14           Sorry.

15   BY MR. GALIPO:

16       Q.   That never crossed your mind that he might just be

17   saying that so that you would stop chasing him?

18       A.   No, sir.

19       Q.   After he said -- and I think you told me earlier

20   that he ran about 60 or yards in between the first time he

21   said, "I'll shoot you" and the last time?

22       A.   Correct.

23       Q.   After he said, "I'll shoot you" the first time, did

24   you try to seek cover?

25       A.   No, sir.  I was in the middle of the dessert or an

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 52

1    open roadway.  There was no cover near me.

2        Q.   Did you decide to stop chasing him at that point?

3             In other words, it might not have been worth it

4    given the situation?

5        A.   No, sir.  I never considered that because when he

6    started heading westbound on Cactus he was heading towards a

7    residential neighborhood.

8        Q.   And I guess the second time he said it, you also did

9    not decide; you didn't seek cover because there really was no

10   cover around?

11       A.   Correct.  Not even concealment.

12       Q.   Didn't you think that was a little odd, someone

13   saying, "I'm going to shoot you" nine times and never seeing

14   an object, and them never trying to shoot you?

15       A.   No.  I think he was in a very disadvantageous

16   position, and that's why he had not presented the firearm

17   yet, and I was at that point I already knew I had more of an

18   advantageous position due to his back being towards me and

19   him having to make a full turn before him having to shoot at

20   me.

21       Q.   Do you know if he -- do you believe now that the

22   object in his hand was a cell phone?

23            MS. ANDERSEN:  Objection to the extent that calls

24   for speculation.

25            But you can answer.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 53

```
 1            THE WITNESS:  I'm sorry.  Ask that question again?
 2   BY MR. GALIPO:
 3       Q.   Sure.  Do you believe now that the object you saw in
 4   his hand was a cell phone?
 5       A.   I know now that the object that I saw was a cell
 6   phone.
 7       Q.   How do you know that it was a cell phone as opposed
 8   to a firearm?
 9       A.   Based on the DOJ's investigation in the report that
10   was provided to me.
11       Q.   Well, after the shooting did you see any guns on the
12   ground or around his body?
13       A.   No, sir.
14       Q.   Do you know if he was searched or patted down for
15   weapons?
16       A.   Yes, sir.  I patted him down before I started giving
17   him aid.
18       Q.   Did you pat him down before or after the responding
19   deputy asked you whether or not he had a gun?
20       A.   After.
21       Q.   So when you said, "I don't know" that was before you
22   had patted him down; is that fair?
23       A.   Correct.
24       Q.   And so when you patted him down, did you find any
25   weapons on his person?
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 54

1    A.   No, sir.

2    Q.   Did you check his pockets?

3    A.   Yes, sir.  I checked his entire body for any weapons

4    that may be on him.

5    Q.   Did you take anything out of his pockets at that

6    point?

7    A.   I don't believe so.

8    Q.   Did you see a cell phone at some point?

9    A.   There was a cell phone near his body.

10    Q.   Where was it in relation to his body?

11    A.   I would be guessing, but it was somewhere within

12    arms' reach, I believe.  I want to say it was close to his

13    head.

14    Q.   As he was -- well, let's back up.

15         You did not see the cell phone when he was in the

16    car; is that true?

17    A.   That's true.

18    Q.   And you did not see a cell phone when he was getting

19    out of the car; is that also correct?

20    A.   That's correct.

21    Q.   When he was running southbound on the shoulder, you

22    didn't see a cell phone at that time; correct?

23    A.   Correct.

24    Q.   And when he was running up until the last time he

25    said, "I'll shoot you" or words to that effect, you did not

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 55

1   see the cell phone; is that also correct?

2       A.   Excluding the last time, correct.

3       Q.   So what I'm wondering is, do you know whether or not

4   he had the cell phone in his hand while he was running up to

5   the last time as opposed to taking it out of a pocket or

6   something?

7       A.   The object I saw was what I believed to be a gun.

8            So being that it was the only black object near his

9   body, I put together that it was probably what he was

10  presenting to me during that turn that led me to believe or

11  know that he was armed at that point.

12      Q.   Right.  My question's a little bit different.

13           I think you told me, you know now for sure the

14  object in his hand was a cell phone.

15      A.   Correct.

16      Q.   And I'm just -- I think you told me that you did not

17  see any object in his hand before he said, "I will shoot you"

18  the last time.

19      A.   Correct.

20      Q.   Okay.  What I was asking you is, do you know now

21  whether he was running the whole time with that object in his

22  hand, or whether you observed him take it out of one of his

23  pockets shortly before the shooting.

24      A.   No.  I do not know whether or not he was, again,

25  yeah, the same answer.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 57

1          My apologies.

2     Q.   That's okay.  I just want make sure I'm

3  understanding what you're saying and I have it correct.

4          As he was going southbound, he looked over his

5  shoulder various times, but did not turn towards you while

6  going southbound; is that correct?

7     A.   Correct.

8     Q.   But when he was going westbound, he slightly turned

9  towards you on two prior occasions?

10    A.   Correct.

11    Q.   But during those prior occasions, you did not see

12  the object?

13    A.   Correct.

14    Q.   So the last time when he turned towards you, that

15  would have been the third time?

16    A.   Correct.

17    Q.   And that time you did see the object?

18    A.   Yes.

19    Q.   And would it have been in his left hand?

20    A.   No.  It would have been in his right hand.

21    Q.   The object was in his right hand?

22    A.   Yes, sir.

23    Q.   Did you see anything in his left hand?

24    A.   No.  It was being swung around his body as he was

25  turning to the side.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 60

```
 1   specifically identify any parts of a gun or what I believed
 2   to be the gun.
 3       Q.   After you patted him down, searched him for weapons,
 4   was he handcuffed?
 5       A.   Yes.  It's kind of a standard procedure to handcuff
 6   the suspect prior to because you don't know what they do have
 7   on them, and if they're going to, you know, attack officers
 8   after coming to or whatever may be.
 9            So he was handcuffed, and then we proceeded to pat
10   him down, and then once that was done, we started rendering
11   aid.
12       Q.   When you patted him, how much time do you think
13   passed in between the shooting and the pat-down?
14       A.   I had to wait for backup to show up.
15            It might have been somewhere around half a minute.
16       Q.   And was he still alive, if you can tell, when you
17   patted him down?
18       A.   Yes, sir.
19       Q.   How could you tell he was still alive?
20       A.   There was still rise and fall of his chest.
21       Q.   And when he was handcuffed, was he still alive?
22       A.   I don't know.  I believe because his body was moving
23   around at that point, I no longer had sight of his chest
24   rising and falling or could hear him breathing.
25            So I don't know if he was alive at that point.
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 61

```
 1      Q.   Did you handcuff him or someone else?

 2      A.   I cuffed him.

 3      Q.   And then was he chest-down at that point?

 4      A.   When I handcuffed him?

 5      Q.   Yes.

 6      A.   Yes, sir.

 7      Q.   Did you check for injuries?

 8      A.   Yes, sir.  So once I handcuffed him, we turned him

 9   over onto his back so he would be resting on his arms, and we

10   started to -- started our primary assessment of his

11   injuries.

12      Q.   And what did you see in that regard, if you

13   recall?

14      A.   I remember looking for holes in the upper thoracic

15   area where I was aiming.  I just saw a lot of blood.  I

16   couldn't identify any specific holes, and then I -- my

17   sergeant was there at the time, and he pointed out that he

18   had a head wound, and that's all I remember seeing at that

19   point.

20      Q.   Did you, in fact, see a head wound at some point?

21      A.   Yes, sir.

22      Q.   That was after the sergeant pointed it out?

23      A.   Correct.

24      Q.   And regarding his upper body, you recall a lot of

25   blood?
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 63

1    that you believe he had a cell phone in his hand when you

2    shot him?

3        A.   No, sir.

4        Q.   Did you tell anyone at the scene that you thought he

5    had gun in his hand when you shot him?

6        A.   Only my partner when he arrived on-scene, and then

7    that would be it.  My sergeant asked for a public safety

8    statement, how many rounds were fired and what direction, but

9    that was it.

10        Q.   You think you told your partner that he had a gun in

11    his hand when you shot him?

12        A.   No, sir.  Let me reiterate that.

13             The partner that arrived on-scene and said, "where

14    is the gun, do we have a gun," I told him, "I don't know

15    where it's at, but he said he was going to shoot me."

16             And then that was it.  That was the only information

17    I had provided anybody.

18        Q.   Now, you've had some training, obviously, with

19    respect to the use of deadly force?

20        A.   Yes, sir.

21        Q.   That was both at the academy and your work in the

22    department?

23        A.   Yes, sir.

24        Q.   Were you trained that deadly force is the highest

25    level of force you can use?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 66

```
1            So without disclosing anything that was discussed

2   between him and his attorney, I'll allow him to answer that

3   question.

4            THE WITNESS:  Based on the advice of my counsel, I

5   made the decision not to make a statement.

6            MR. GALIPO:  Okay.  I think I'm just about done.

7            I would like to take one last break for five or

8   seven minutes, and then we can finish it up.

9            MS. ANDERSEN:  That works.

10           (Recess taken.)

11  BY MR. GALIPO:

12      Q.   In foot pursuit situations, did you have some

13  training on setting up perimeter or containment?

14      A.   Yes, sir.

15      Q.   And you communicated you were in a foot pursuit;

16  correct?

17      A.   Yes, sir.

18      Q.   And that's part of your training?

19      A.   Yes, sir.

20      Q.   To let dispatch know you're in a foot pursuit, but

21  also to let fellow officers know?

22      A.   Yes, sir.

23      Q.   So that they could potentially come and assist?

24      A.   Correct.

25      Q.   And how long was it after the shooting until you saw
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 67

1    another officer on-scene?

2       A.   Somewhere around 30 seconds before somebody arrived

3    on-scene.

4       Q.   Were you aware that officers were in route, or did

5    you anticipate that because you communicated foot pursuit?

6       A.   I anticipated because I put out that one was running

7    and I was pursuing.

8       Q.   Did you ever consider while you were chasing him

9    after he said, "I will shoot you" creating a little more

10   distance but keeping him in sight and waiting for backup

11   units to arrive?

12      A.   I'm sorry.  Can you ask that again?

13      Q.   Sure.  When you were chasing him and he started

14   going, you know, westerly direction, and then said, "I will

15   shoot you" multiple times, did you consider that he might

16   have a gun?

17      A.   Yes, sir.

18      Q.   And at that point did you consider tactically maybe

19   I should distance myself a little bit and keep him in sight

20   and wait for the backup units to get there so we can, you

21   know, put together a tactical plan?

22      A.   No, sir.  Because of the direction he was heading.

23          He was heading towards a residential neighborhood,

24   and I didn't want to give up the ground or my distance to

25   him.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 68

1    Q.   How close do you think he was to the residential

2  neighborhood at the time of the shooting?

3    A.   He was coming up on the corner that you would have

4  to turn on.   So I want to say it was maybe -- it was maybe 50

5  or 60 yards away from us further west.

6    Q.   Did you ever communicate over your police radio that

7  you thought he had a gun before the shooting?

8    A.   No, sir.

9    Q.   Did you ever communicate over your police radio that

10  you thought he had a gun after the shooting?

11    A.   No, sir.

12    Q.   Okay.   I think that's all the questions I have.

13         MR. GALIPO:   Kayleigh, do you have any questions

14  today?

15         MS. ANDERSEN:   Very few.

16         MR. GALIPO:   Okay.

17                        EXAMINATION

18  BY MS. ANDERSEN:

19    Q.   Deputy Lopez, what name did the passenger and the

20  vehicle give you during your initial traffic stop?

21    A.   He gave me the name of Andy Atkins or Andrew I

22  believe he clarified it as.

23    Q.   During the foot pursuit what did you refer to him

24  as?

25    A.   Atkins.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 69

1      Q.    Do you now know the name of the individual that you

2    were in the foot pursuit with?

3      A.    Yes.  It was Shane Holland.

4            MS. ANDERSEN:  That's all I have, Dale.

5            MR. GALIPO:  Okay.  I have no further questions.

6            (Deposition proceeding concluded at 12:05 p.m.)

7                          *   *   *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 71

1                              CERTIFICATE

2                                  OF

3           CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5           I, JINNA GRACE KIM, CSR No. 14151, a Certified

6   Stenographic Shorthand Reporter of the State of California,

7   do hereby certify:

8           That the foregoing proceedings were taken before me

9   at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11  prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13  by me, using machine shorthand, which was thereafter

14  transcribed under my direction;

15          Further, that the foregoing is an accurate

16  transcription thereof.

17          I further certify that I am neither financially

18  interested in the action, nor a relative or employee of any

19  attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22  date:  April 11, 2024.

23          _____

24          Jinna Grace Kim, CSR No. 14151

25