**EXHIBIT G**

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4    A.H., et al,

 5                   Plaintiffs,

 6          vs.                             Case No.: 5:23-cv-01028-JGB-SHK

 7    COUNTY OF SAN BERNARDINO, JUSTIN
      LOPEZ, and DEOS , inclusive,
 8
                     Defendants.
 9    _____

10        AND ALL RELATED CROSS-ACTIONS.

11    _____

12

13                     DEPOSITION OF MARK RIOS

14                        June 25, 2024

15                          12:45 PM

16

17           REMOTE DEPOSITION VIA TELECONFERENECE

18

19

20

21

22

23

24    REPORTED BY:
      ELIZABETH CHAE
25    CSR No. 14633
```

A.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Mark Rios on 06/25/2024

Page 2

```
 1    APPEARANCES:

 2    For Plaintiffs:

 3
              LAW OFFICES OF DALE GALIPO
 4            BY: RENEE V. MASONGSONG
              21800 Burbank Boulevard,
 5            Suite 310.
              Woodland Hills, CA
 6            91367
              818.347.3333
 7            rvalentine@galipolaw.com

 8

 9    For Defendants:

10            MANNING & KASS
              ELLROD, RAMIREZ, TRESTER LLP
11            BY: KAYLEIGH ANDERSON, ESQ.
              801 Figueroa Street
12            15th Floor.
              Los Angeles, CA.
13            90017
              kayleigh.andersen@manningkass.com
14

15

16

17

18

19

20

21

22

23

24

25
```

Page 12

```
 1   clarifying.  We went to make sure we have a clean
 2   record.  Did you hear at some point some radio
 3   communication indicating that Deputy Lopez was
 4   initiating a traffic stop?
 5        A.  Yes, ma'am.
 6        Q.  And where were you when you first heard that
 7   communication?
 8        A.  I believe I had just sat down in the Sergeant's
 9   office.
10        Q.  And that was over the radio; is that correct?
11        A.  That I heard the traffic?
12        Q.  Yes.  That you heard that Deputy Lopez was
13   conducting a traffic stop.
14        A.  Yes, ma'am.
15        Q.  And when you're at the station, this might be a
16   silly question, but do you have some sort of computer or
17   some other screen that you can look at and see
18   communications with respect to certain calls?
19        A.  Yes, ma'am.
20        Q.  And that might be a little bit of a confusing
21   question.  My understanding is there's some sort of
22   computer screen, like in the patrol vehicles, where you
23   can see some of that information; is that right?
24        A.  Yes, ma'am.
25        Q.  I was just wondering if you had something
```

1    similar at the station where you could see
2    communications in a different way other than just the
3    radio?
4         A.   So the Watch Commander normally brings his
5    computer that's in the vehicle into the station with
6    him, which is what I did that night.
7         Q.   Okay, okay.  I didn't realize you could take it
8    in and out of the car so that clears up some of my
9    confusion.  During this -- let me say, on the date of
10   this incident, did you receive some communications or
11   information regarding Shane Holland on that police
12   computer?
13        A.   No, ma'am.
14        Q.   Okay.  At some point, did you receive a
15   communication in some form that Deputy Lopez had quote
16   unquote "one running?"
17        A.   Yes, ma'am.
18        Q.   And did that generally indicate that he was
19   involved in a foot pursuit?
20        A.   Yes, ma'am.
21        Q.   And that's a communication that you heard over
22   the radio?
23        A.   Yes, ma'am.
24        Q.   And were you still at the station when you
25   heard that communication?

Page 15

```
 1      A.  I believe I went over the air and asked to have
 2   them show me en route.
 3      Q.  And did you indicate in any other way that you
 4   were responding as backup, for example, on the computer
 5   or a phone conversation?
 6      A.  No, ma'am.
 7      Q.  At any point before you arrived on scene, did
 8   you hear any radio communications that any other
 9   officers were responding to assist?
10      A.  I don't remember, ma'am.  I just remember Lopez
11   putting out "one running" and there was more radio
12   traffic.  Again, I was trying to listen to Lopez and
13   what was going on with him.  So if there was, I don't
14   remember, ma'am.
15      Q.  Okay.  Approximately how long did it take you
16   to drive to the scene of the incident?
17      A.  I would say a minute or two.
18      Q.  And at some point did you hear some
19   communications over the radio that said "shots fired" or
20   words to that effect?
21      A.  Yes, ma'am.
22      Q.  And were you driving to the scene of the
23   incident when you heard that?
24      A.  Yes, ma'am.
25      Q.  And when you heard that communication "shots
```

```
 1  law-enforcement, if a peace officer believes that a
 2  subject has a gun, is that peace officer trained to put
 3  that information out over the radio, that the subject
 4  might have a gun?
 5          KAYLEIGH ANDERSEN:  Same objections.  You can
 6  answer.
 7          THE WITNESS:  Ma'am, that depends on what's going
 8  on with the scene.  If he has time to put it out, is his
 9  focus on the gun, or if there was a gun.  Again that
10  depends on each individual Deputy and what they're able to
11  put out at the time that they're going through it.  So
12  yes, you would like to get information out, however, I
13  wasn't there.  I don't know what he was seeing, hearing
14  feeling, smelling.  I don't know, ma'am.
15  BY RENEE MASONGSONG:
16      Q.  So in other words, is the training that if it's
17  feasible, then the officer should attempt to provide
18  that that information over the radio, when feasible?
19          KAYLEIGH ANDERSEN:  Objection.  Lacks foundation.
20  You can answer.
21          THE WITNESS:  Not necessarily, ma'am.
22  BY RENEE MASONGSONG:
23      Q.  Okay.  About how much time passed between you
24  hearing the communication that shots had been fired and
25  you arriving on scene?
```

1      A.   Maybe a minute.
2      Q.   And do you recall what street you parked your
3  vehicle on when you arrived on scene?
4      A.   Yes, ma'am.
5      Q.   And what street was that, please?
6      A.   Cactus.
7      Q.   And if you know, where did you park in relation
8  to Deputy Lopez's vehicle?
9      A.   I believe Deputy Lopez's vehicle was parked on
10 395 and I passed it and parked on Cactus.
11     Q.   Okay, thank you.  And after you parked your
12 vehicle, did you approach Deputy Lopez on foot?
13     A.   Yes, ma'am.
14     Q.   And how were you able to locate him exactly?
15 For example, did you get some additional information out
16 over the radio as to his exact location?
17     A.   I saw a patrol car stopped on Cactus which I
18 assumed Deputy was there to help Deputy Lopez.
19     Q.   And after you got out of your vehicle, did you
20 see a Deputy Hillebrand on scene?
21     A.   Yes, ma'am.
22     Q.   And did you observe him with this firearm out?
23     A.   I did.
24     Q.   And when you first saw Deputy Lopez, did he
25 have his firearm out?

Page 20

1   was -- and stood up as I was getting out of my vehicle.

2        Q.   And at that time, when you're making this

3   observation, did you see any civilians in the vicinity

4   of Deputy Lopez or Mr. Holland?

5        A.   I did not.

6        Q.   Did you search Mr. Holland and some point?

7        A.   Yes, ma'am.

8        Q.   And was that pretty shortly after you arrived?

9        A.   Yes, ma'am.

10       Q.   After you arrived on scene, but before you

11  searched Mr. Holland, did you ask any Deputy whether

12  anyone had already conducted a pat-down search of

13  Mr. Holland?

14       A.   I don't recall, ma'am.

15       Q.   Did you find any weapons on Mr. Holland's

16  person?

17       A.   I did not.

18       Q.   Did you ever observe any weapons in the

19  vicinity of Mr. Holland?

20       A.   I did not.

21       Q.   And that would obviously be other than the

22  deputies' weapons, just to clarify.  Do you know one way

23  or the other whether any weapons were found on

24  Mr. Holland's person after the shooting?

25            KAYLEIGH ANDERSEN:  Object to the extent it calls

1  for speculation, but you can answer.
2          THE WITNESS:  I do not.
3  BY RENEE MASONGSONG:
4      Q.  Did you observe a cell phone near Mr. Holland?
5      A.  Yes, ma'am.
6      Q.  And as far as you recall, where was that cell
7  phone located in relation to Mr. Holland?
8      A.  Ma'am, I believe it was approximately 3 feet
9  east -- northeast from him.
10     Q.  And other than the cell phone, did you see any
11 other objects near Mr. Holland at that time?
12     A.  A hat.
13     Q.  When you first arrived on scene did you say
14 anything to Deputy Lopez?
15     A.  I believe Deputy Lopez asked me if I had a
16 trauma kit.
17     Q.  And after he asked you that, did you go get the
18 trauma kit?
19     A.  Yes, ma'am.
20     Q.  And other than that communication, did you have
21 any other conversation with Deputy Lopez outside of the
22 Public Safety Statement?
23     A.  No, ma'am.
24     Q.  At any point when you were on scene, did you
25 ever hear Deputy Lopez say that he saw a gun?

Page 23

1    Q.  And at any point, did you ever learn how many
2    rounds were actually fired during the incident?
3    A.  I have not asked.  No, ma'am.
4    Q.  And during the Public Safety Statement, did
5    Deputy Lopez tell you that he was about seven yards away
6    from Mr. Holland when he fired his rounds?
7    A.  I don't recall exactly, ma'am, but I believe
8    that's roughly the estimate.
9    Q.  Okay.  And just a few more questions on this
10   point.  At any point when you were on scene, did you
11   ever hear Deputy Lopez say that Mr. Holland had turned
12   toward him?
13   A.  I don't recall, ma'am.
14   Q.  And do you recall ever hearing Deputy Lopez say
15   that Mr. Holland stated to him that he had a gun?
16   A.  Can you ask that again please, ma'am.
17   Q.  Sure.  At any point when you were on scene,
18   did you ever hear Deputy Lopez say that Mr. Holland told
19   him that he had a gun?
20   A.  Ma'am, I don't recall.  It was pretty crazy.  I
21   was trying to get people there, trying to make sure
22   everything was taken care of.
23   Q.  ==Understood.  As some point did you search for==
24   ==some wounds or injuries on Mr. Holland?==
25   ==A.  Yes, ma'am.==

```
 1      Q.  And what injuries did you observe on
 2   Mr. Holland?
 3      A.  The one I noticed was the injury to his head.
 4      Q.  And did that appear to be a gunshot wound?
 5          KAYLEIGH ANDERSEN:  Object to the extent that it
 6   calls for a medical opinion, but you can answer.
 7          THE WITNESS:  I saw an injury to his head, ma'am.
 8   BY RENEE MASONGSONG:
 9      Q.  And can you describe the injury, please?
10      A.  It was an apparent -- what I believe to be a
11   gunshot wound to the top of his head.
12      Q.  When you were searching for Mr. Holland's
13   injuries, did you observe Mr. Holland taking any
14   breaths?
15      A.  Yes, ma'am.  When he was facedown.
16      Q.  And can you describe his breathing for me at
17   that time?
18      A.  To the best my recollection, gaspy and shallow.
19      Q.  And then at some point, was Mr. Holland turned
20   on to his back?
21      A.  Yes, ma'am.
22      Q.  Did you hear Mr. Holland take any breaths after
23   he was turned on to his back?
24      A.  I believe at that time he stopped breathing.
25      Q.  The injury that you described, was there some
```

```
 1   blood associated with that injury?
 2        A.   There was blood on the asphalt and Mr. Holland.
 3        Q.   And at that time, did you provide any sort of
 4   medical attention?  I know you told me you got the
 5   trauma kit.  After that, did you provide any medical
 6   attention to Mr. Holland?
 7        A.   I ripped open the bag to see if he had any
 8   sucking chest wounds.  In other words, being shot in the
 9   chest.  And then when I saw his head, that's when I
10   stopped.
11        Q.   And at some point you observed medical
12   personnel such as the paramedic contacting Mr. Holland;
13   is that correct?
14        A.   Yes, ma'am.
15        Q.   Do you know one way or the other, if medical
16   had already been called before you arrived on scene?
17        A.   To the best of my recollection, I do believe
18   they were called for prior to me arriving on scene.
19        Q.   And approximately how much time passed between
20   you arriving on scene and medical personnel contacting
21   Mr. Holland?
22        A.   Best estimate, a minute or two.
23        Q.   Had you ever seen Mr. Holland prior to this
24   incident?
25        A.   No, ma'am.
```

Page 32

1   STATE OF CALIFORNIA         )

2           I, ELIZABETH CHAE, Certified Shorthand Reporter,

3   in and for the State of California, Certificate No. 14633,

4   do hereby certify:

5           That prior to being examined, the witness named

6   in the foregoing deposition was by me first duly sworn to

7   testify to the truth, the whole truth, and nothing but the

8   truth.

9           That said deposition was taken before me at the

10  time and place therein set forth and were taken down by me

11  in shorthand and thereafter transcribed into typewriting

12  under my direction and supervision.

13          I further certify that I am neither counsel for,

14  nor related to, any party to said action, nor in any way

15  interested in the outcome thereof.

16          In witness whereof, I have hereunto subscribed
    my name.
17

18  Dated: June 25, 2024

19

20  *[signature: Elizabeth Chae]*

21  _____
    ELIZABETH CHAE
22  CSR No. 14633

23

24

25