# EXHIBIT 1

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

```
 1                    UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.H. and H.H., in each case a minor,  )
     by and through their guardian ad      )
 5   litem Crystal Hanson, individually    )
     and as successor in interest to Shane )
 6   Holland, deceased; C.H., a minor by   )
     and through her guardian ad litem,    )
 7   Reymi Updike; individually and as     )
     successor in interest to Shane        )
 8   Holland, deceased, and PATRICIA       )
     HOLLAND, individually,                )
 9                                         )
                    Plaintiffs,            )
10                                         )
                    vs.                    )Case No.
11                                         )5:23-CV-01028-SHK
     COUNTY OF SAN BERNARDINO; JUSTIN      )
12   LOPEZ, DOES 1-10, inclusive,          )
                                           )
13                    Defendants.          )
     _____)

14

15

16

17            REMOTE VIDEOCONFERENCE DEPOSITION OF

18                        JUSTIN LOPEZ

19                    FRIDAY, APRIL 11, 2024

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  62323
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 2

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.H. and H.H., in each case a minor,  )
     by and through their guardian ad      )
 5   litem Crystal Hanson, individually    )
     and as successor in interest to Shane )
 6   Holland, deceased; C.H., a minor by   )
     and through her guardian ad litem,    )
 7   Reymi Updike; individually and as     )
     successor in interest to Shane        )
 8   Holland, deceased, and PATRICIA       )
     HOLLAND, individually,                )
 9                                         )
                  Plaintiffs,              )
10                                         )
                  vs.                      )Case No.
11                                         )5:23-CV-01028-JGB-SHK
     COUNTY OF SAN BERNARDINO; JUSTIN      )
12   LOPEZ, DOES 1-10, inclusive,          )
                                           )
13                  Defendants.            )
     _____)

14

15

16

17         The remote videoconference deposition of JUSTIN

18   LOPEZ, taken on behalf of the Plaintiffs, beginning at 10:04

19   a.m., and ending at 12:05 p.m., on Friday, April 11, 2024,

20   before Jinna Grace Kim, Certified Stenographic Shorthand

21   Reporter No. 14151.

22

23

24

25
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 3

```
 1    APPEARANCES OF COUNSEL:

 2
      For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:  DALE K. GALIPO, ESQ.
              BY:  RENEE V. MASONGSONG, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  rvalentine@galipolaw.com
 8

 9    For the Defendants:

10            MANNING & KASS ELLROD, RAMIREZ, TRESTER, LLP
              BY:  KAYLEIGH ANDERSEN, ESQ.
11            801 South Figueroa Street, 15th Floor
              Los Angeles, California 90017
12            Tel:  213-624-6900
              E-mail:  kaa@manningllp.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 7

```
 1   but you couldn't find it?

 2      A.   Correct.

 3      Q.   Did you give a statement a formal interview

 4   following the incident?

 5      A.   No, sir.

 6      Q.   Were you asked to give a statement by someone?

 7      A.   The DOJ asked if I would give one, yes.

 8      Q.   When did the DOJ ask if you would give a statement

 9   in relation to the shooting incident?

10      A.   I believe it was a week to two weeks after the

11   incident took place.

12      Q.   And you had not given any statement prior to that?

13      A.   Correct.

14      Q.   Did you have an understanding as to why the DOJ was

15   doing the investigation?

16      A.   Yes, sir.

17      Q.   What was your understanding?

18      A.   That it's part the criminal investigation process.

19      Q.   In other words, did you have an understanding as to

20   why the DOJ was doing it rather than the District Attorney's

21   Office?

22      A.   Yes, sir.

23      Q.   What was your understanding?

24      A.   Because the Senate Bill 2.

25      Q.   What specifically about it?
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 8

1   A.   Based -- so after the incident it was found that

2   Shane Holland didn't have a firearm.  So it was the lethal

3   force encounter of our officer-involved shooting suspect who

4   was unarmed.

5       So that's why the DOJ got involved.

6   Q.   Did you inform the DOJ whether or not you were

7   willing to give a statement?

8   A.   My lawyer did.

9   Q.   Who was your lawyer, if you recall?

10  A.   I'm drawing a blank on his name right now, sir.

11  Q.   That's okay.  We're easily forgettable.

12      I get it.  But was it your understanding that your

13  lawyer declined for you to give a statement?

14  A.   Yes, sir.

15  Q.   So is this the first time since the incident you're

16  giving me a formal statement?

17  A.   Yes, sir.

18  Q.   What was the date of the incident?

19  A.   I do not recall the specific date.

20  Q.   Do you recall the month or the year?

21  A.   It was June of 2022.

22  Q.   Do you know about what time it happened?

23  A.   I know it was early morning hours around 2 or 3

24  o'clock in the morning.

25  Q.   Obviously, it would have been dark outside?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 12

```
 1   six months later.

 2       Q.   And then after that did your assignment change?

 3       A.   Yes, sir.

 4       Q.   And how so?

 5       A.   I was assigned to be patrol deputy at the Victor

 6   Valley Station.

 7       Q.   And did you have a period of field training for

 8   that?

 9       A.   Yes, sir.

10       Q.   How long was the field training, approximately?

11       A.   Approximately 16 weeks, I believe.

12       Q.   And when did your field training for patrol end,

13   approximately?

14       A.   I want to say it was August of 2020.

15            I might have my math wrong.

16       Q.   Is that an approximation?

17       A.   Yes, sir.

18       Q.   And so how long do you think you've been -- we're

19   out of field training when our shooting incident that we're

20   hear about occurred?

21       A.   I want to say about three years.

22       Q.   You fired some shots in this incident; is that

23   correct?

24       A.   Yes, sir.

25       Q.   How many shots did you fire?
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 13

```
 1      A.    Six.

 2      Q.    What type of weapon did you fire the shots from?

 3      A.    Glock 21, a 45-caliber.

 4      Q.    And you were aiming at Mr. Holland?

 5      A.    Yes, sir.

 6      Q.    What portion of his body were you aiming at?

 7            Would it have been center mass from your

 8   perspective?

 9      A.    Yes, sir.  His upper thoracic area.

10      Q.    When you fired your shots were you stationary or

11   moving?

12      A.    I was moving.

13      Q.    Did you have your gun in one hand or two?

14      A.    Two hands.

15      Q.    What would you estimate the distance to be between

16   you and Mr. Holland when you fired your first shot?

17      A.    No more than ten yards.

18      Q.    You played some football, so when you say ten yards,

19   you're approximating like 30 feet or less?

20      A.    Correct.

21      Q.    So are you saying you think you were within 30 feet

22   from him when you fired your first shot?

23      A.    Yes, sir.

24      Q.    Did the distance between you and Mr. Holland change

25   at all during the shooting sequence?
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 14

1    A.    Yes, sir.

2    Q.    How so?

3    A.    I was -- I continued advancing on Holland while I

4    was shooting, and I might have closed the gap five to ten

5    feet in the process.

6    Q.    So by the time of the last shot, it might have been

7    20 or 25 feet in between you?

8    A.    Approximately.

9    Q.    Prior to your first shot did you ever specifically

10    identify a gun in his hand?

11    A.    Never specifically a gun, no, sir.

12    Q.    Did you ever specifically identify a gun anywhere on

13    his person before you fired the first shot?

14    A.    No, sir.

15    Q.    I'll make it broader.

16         Is it a fair statement that you never identified a

17    gun in his hand or on his person at any time before or during

18    the shooting?

19    A.    No, sir.  I never positively identified a gun.

20         I saw what I believe may have been a gun.

21    Q.    I take it a gun, you have some familiarity with

22    guns?

23    A.    Yes, sir.

24    Q.    And your gun, for example, has various parts to

25    it?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 15

1    A.    Correct.

2    Q.    And I know I'm not going to name all the parts, but

3    for example, it has a barrel, a grip, trigger, trigger guard,

4    things of that nature?

5    A.    Yes, sir.

6    Q.    Did you identify any specific parts of a gun --

7    A.    No, sir.  Sorry I didn't mean to cut you off.

8    Q.    That's okay.  You already knew what I was going to

9    ask, but remember, we have to have a slight pause for our

10   court reporter.

11   A.    I'll do that.

12   Q.    So just to make sure I'm understanding what you're

13   saying, you never identified any specific parts of the gun in

14   any objects on Mr. Holland; is that correct?

15   A.    Correct.

16   Q.    Do you recall after the shooting, another officer

17   arriving near where you were at?

18   A.    Yes, sir.

19   Q.    Do you know who that officer was?

20   A.    It was Deputy Hillibrand.

21   Q.    And when you listened to the audio of the incident

22   after the shooting, did you hear some of the conversation

23   between you and that deputy?

24   A.    Yes, sir.

25   Q.    Do you recall the deputy asking you whether there

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 16

1  was a gun, or words to that effect?

2      A.   Yes, sir.

3      Q.   And do you recall what your response was to him?

4      A.   Yeah.  I advised him I didn't know where the gun

5  was, and he said that he had one.

6      Q.   You're saying that you told the deputy you didn't

7  know where the gun was?

8      A.   Correct.

9      Q.   But that he said he had a gun, referring to

10  Mr. Holland?

11      A.   Correct.

12      Q.   Have you ever been provided with a transcript of the

13  audio that led up to the shooting?

14      A.   I saw it in the DOJ report, I believe.

15      Q.   Did Mr. Holland ever specifically tell you he had a

16  gun?

17      A.   No, sir.  He just made statements similar to

18  somebody who would have a gun.

19      Q.   He was saying I will shoot you, or words to that

20  effect?

21      A.   Yes, sir.

22      Q.   But would you at least agree he never specifically

23  said I have a gun?

24      A.   I would agree.

25      Q.   Do you recall when the deputy asked, "Where is the

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 17

1    gun, do we have a gun," you saying, "I don't know?"

2         A.   Yes, sir.

3         Q.   Okay.  So let's go back to the beginning of this

4    incident.

5              Did something initially draw your attention to a

6    vehicle involved in this incident?

7         A.   Yes, sir.

8         Q.   And what drew your attention?

9         A.   I was -- so I was -- I was driving towards the

10   County pumps and was coming to the end of my shift, and I saw

11   a vehicle that didn't have a license plate.

12             So I initiated a traffic stop based on the belief

13   there was no license plate on it.  The vehicle yielded, and

14   when I exited the vehicle, I found out that it did have a

15   license plate.  It was just not mounted where license plates

16   are typically mounted.

17             And it didn't have any lighting, and then the

18   reflective coating on the plate was scratched off, so I

19   didn't see the plate initially.

20        Q.   So let me just ask you a few questions about that.

21             It sounds like this happened in the latter part of

22   your shift.

23        A.   Correct.

24        Q.   Were you in a patrol vehicle by yourself?

25        A.   Yes, sir.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 18

1    Q.    And the vehicle that you observed, where was the

2    vehicle when you first observed it?

3    A.    I believe it was on -- it was on US highway 395

4    approximately -- it was just north of a stop at Adelanto Road

5    when I first saw it.

6    Q.    Was it moving or stopped when you first observed

7    it?

8    A.    It was moving in the same direction of travel as I

9    was.

10    Q.    And were you behind it?

11    A.    I don't think initially I was, but I moved behind it

12    to initiate the traffic stop.

13    Q.    What type of vehicle was it, if you recall?

14    A.    I remember being an older model SUV.

15         I read the report.  It's a Ford Explorer.

16         I don't remember the year, though.

17    Q.    It's okay.  Do you recall the color?

18    A.    I remember it was dark in color.

19    Q.    And how far away was it from you when you first

20    observed it?

21    A.    Maybe 100 yards, 200 yards.

22         I don't know.  It's hard to estimate when I first

23    laid eyes on the vehicle on the highway.

24    Q.    Approximately how far were you from the vehicle when

25    you thought it did not have a license plate?

A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Justin Lopez on 04/11/2024

Page 19

1     A.    Maybe two vehicle lengths.

2     Q.    What type of vehicle were you driving?

3     A.    It's a County patrol -- standard County patrol

4   vehicle.  It's a Ford Explorer.

5     Q.    So when you say two vehicle lengths, do you have

6   about the Ford Explorer in mind?

7     A.    Yes, sir.

8     Q.    When you initiated the stop, what was the

9   approximate distance between your vehicle and the subject

10  vehicle?

11    A.    About a car length.

12    Q.    Other than the license plate issue, was the vehicle

13  speeding or committing other moving violations prior to you

14  pulling it over?

15    A.    No, sir.

16    Q.    Do you know what the speed limit is on that area of

17  the roadway?

18    A.    55 miles-an-hour.

19    Q.    And do you have an estimate as to the speed of the

20  vehicle when you first observed it?

21    A.    Nothing that comes to mind specifically.

22    Q.    But it appeared to be going within the speed

23  limit?

24    A.    Correct.

25    Q.    Now I just want to make sure I'm understanding your

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 20

1   testimony and about the plate, and I'm sorry I'm asking some

2   follow-up questions, but because I don't have a statement

3   from you or prior interview, I don't know your thought

4   process.

5           Are you saying that the vehicle ended up having a

6   license plate, but it was in a different spot than you would

7   normally expect it?

8       A.   Yes, sir.

9       Q.   Where was the license plate on the vehicle?

10      A.   It was mounted to the tailgate of the vehicle just

11  below the rear window.

12           I believe it neighbored the driver side.

13      Q.   And when did you notice that it had a license

14  plate?

15      A.   Upon approach.

16      Q.   And when you activated your lights to pull the

17  vehicle over, did it timely pull over?

18      A.   Yes, sir.

19      Q.   Did you call-in the plate of the vehicle?

20      A.   Yes, sir.

21      Q.   And did it come back with any history as far as

22  wants or warrants or stolen or anything like that?

23      A.   No, sir.

24      Q.   Did it indicate, if you recall, who the registered

25  owner of the vehicle was?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 24

```
 1   had with people under the influence of central nervous

 2   stimulants, he was giving me those projected signs and

 3   symptoms that led me to believe he may possibly be under the

 4   influence.

 5        Q.   Did you ask him any questions about that?

 6        A.   I did not.

 7        Q.   Did you say anything to the effect, you know, have

 8   you had anything to drink, are you under the influence of

 9   drugs at all, medication, anything like that?

10        A.   I did not.

11        Q.   Did you mention to him that you noticed he that he

12   seems like he's sweating or moving erratically, is he okay,

13   does he need any medical attention, or anything like that?

14        A.   I did not point those things out.

15        Q.   Were you aware at the time you approached the

16   passenger side of the vehicle, the conversation was being

17   recorded?

18        A.   Yes, sir.

19        Q.   Did you let the people in the car know that the

20   conversation was being recorded?

21        A.   No, sir.

22        Q.   Was there any weapons that you saw in the car during

23   the time frame you were at the passenger side?

24        A.   No, sir.

25        Q.   How long do you think you were at the passenger side
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 26

1    Q.   After you got the information on the passenger side

2    of the car, did you stay in that area, or did you tactically

3    reposition more towards your vehicle for a short time?

4    A.   Once I gathered the information from both the driver

5    and the passenger, I walked back to my patrol vehicle, and I

6    patrol vehicle's radio to run the two people over the air

7    while standing behind the passenger door.

8    Q.   Did either of the occupants verbally or physically

9    threaten to harm you while they were in the car and you were

10   on the side?

11   A.   No.

12   Q.   Did anybody say that they had a gun or anything like

13   that while you were on the side?

14   A.   No, sir.

15   Q.   Did you notice any cell phones in the car at that

16   point?

17   A.   No, sir.

18   Q.   And did you actually go back in your car, or were

19   you standing close to the car when you were calling-in the

20   information?

21   A.   I was standing close to the car.

22   Q.   Would that be on the driver side?

23   A.   No.  The passenger side.

24   Q.   And were either one of your spotlights illuminating

25   their vehicle, if you recall?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 27

```
 1      A.   I believe I used all of my lights on my vehicle.

 2      Q.   And was their vehicle on the shoulder of the road at

 3   that point?

 4      A.   Yes, sir.

 5      Q.   And then at some point did you observe Mr. Holland

 6   getting out of the vehicle?

 7      A.   Yes, sir.

 8      Q.   And were you on the passenger side of your vehicle

 9   when he got out?

10      A.   Yes, sir.

11      Q.   Had you received any of the information back yet

12   regarding the individuals in the car?

13      A.   No.

14      Q.   Did you have a chance to call the information in?

15      A.   I had a chance to -- are you -- are you speaking of

16   being able to relay the information provided me to dispatch?

17      Q.   Yes, exactly.

18      A.   Yes.  I was able to give both names and birthdays

19   provided to me.

20      Q.   So you were able to do that before Mr. Holland got

21   out?

22      A.   Correct.

23      Q.   But you didn't get any information back before he

24   got out; is that fair?

25      A.   That's correct.
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 28

1    Q.    And did you actually observe Mr. Holland getting out

2  of the car?

3    A.    Yes, sir.

4    Q.    And when he got out of the car, how far away were

5  you from him, approximately?

6    A.    I was aware the vehicle -- my vehicle's parked.

7          So again, approximately a vehicle length away, and

8  then, you know, a few feet back to account for that space

9  between the front of the car and the passenger door.

10    Q.    And was the lights from your vehicle illuminating

11  Mr. Holland when he got out of the car?

12    A.    Yes, sir.

13    Q.    Did he say anything to you when he got out of the

14  car?

15    A.    No, sir.

16    Q.    Did you see any gun in his hand or on his person

17  when he got out?

18    A.    No.  I saw -- I saw him side-step around the door

19  he had opened and continue facing away from me, and his hands

20  were positioned in front of him as if he was holding onto his

21  waistband or waistband area.

22    Q.    Could you actually see his hands at that point?

23    A.    No, sir.

24    Q.    Could you actually see his hands in contact with his

25  waistband?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 29

 1    A.   No, sir.  I didn't see where -- what his hands were

 2   holding at all.

 3    Q.   Did you see any object in his hands as he was

 4   getting out of the vehicle?

 5    A.   No, sir.  He was completely faced away from me.

 6    Q.   Okay.  We're going to try to show an exhibit, I

 7   think is an overhead view of the area this happened.

 8         Renee will help me, and we're going to see if we can

 9   share the screen so we can all see it together.

10         Yeah.  You're good.  I think in a few seconds,

11   hopefully, we'll see an image.

12         (Exhibit 1 was marked for identification.)

13   BY MR. GALIPO:

14    Q.   Can you see the image on your screen?

15    A.   Yes, sir.

16    Q.   We'll mark this as Exhibit 1, and I realize it's an

17   overhead and everything's really small, but towards the top

18   of the image, there appears to be a roadway and two vehicles

19   on the shoulder.

20         Do you see that area?

21    A.   Yes.  Are you referring to my patrol vehicle and

22   the --

23    Q.   I think so.  I want to verify with you that it's

24   your patrol vehicle and the subject vehicle.

25    A.   It is.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 31

```
 1   BY MR. GALIPO:
 2       Q.   And I just want this as a visual, when Mr. Holland
 3   got out of the vehicle, did he start moving or running away
 4   from you at some point?
 5       A.   Yes, sir.
 6       Q.   And did you follow him to the best of your
 7   ability?
 8       A.   Can you clarify your question?
 9       Q.   Yeah.  Did you run after him?
10       A.   Yes, sir.
11       Q.   Which general direction did he run?
12       A.   He ran south on 395, initially.
13       Q.   So like on the shoulder of the road, initially?
14       A.   Correct.
15       Q.   And for how long approximately did he run on the
16   shoulder of the road going southbound?
17       A.   If you could see that conex [phonetic] box
18   approximately to that area before he started heading west.
19       Q.   So to go west, that would be to the -- he would go
20   to his right from going south; he would turn to his right?
21       A.   Correct.
22       Q.   Now, I know at some point, and I know he said it
23   more than once, words to the effect, "I'm going to shoot
24   you."
25           Did you hear that when he said that?
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 33

1    A.    It wasn't in a like a 90-degree turn kind of

2    fashion.    It was more of a gradual turn to the westbound

3    point of direction.

4    **Q.    And in looking at anything in this image, could you**

5    **see approximately where he was when he started to turn in a**

6    **westerly direction?**

7    A.    Again, it was around the corner.    So where that

8    conex box was I believe he cut through that dirt field.

9         He wasn't necessarily running straight at all.

10         He was zigzagging in his motion.    So he was very

11    unpredictable as to where he was going.

12    **Q.    And where was he approximately when he first said,**

13    **"I will shoot you," or words to that effect?**

14    A.    If I had to give you an approximation, I would say

15    maybe 30 yards, 40 yards from the corner of 395 and Cactus.

16         And that would be --

17    **Q.    And once he --**

18    A.    Sorry.

19    **Q.    Sorry.    Go ahead.**

20    A.    I said that would we the northwest corner of 395 and

21    Cactus.

22    **Q.    Was he running away from you when he initially said,**

23    **"I will shoot you?"**

24    A.    Yes, sir.

25    **Q.    And he said it more than once; is that fair?**

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 37

1    Q.    I think so.  His back was generally towards you as

2    he was running southbound?

3    A.    When we were running southbound, that's correct.

4    Q.    And how far were you running behind him during that

5    part of the foot pursuit?

6    A.    I maintained the same distance the entire pursuit

7    because of his posturing.

8    Q.    And what was that approximate distance that you

9    maintained during the entire pursuit?

10    A.    Approximately ten yards.

11    Q.    And were you also running on the shoulder during the

12    initial part of the pursuit?

13    A.    I was running in the same direction as him.

14    I was trying to stay behind him, but I was also

15    creating an irregular pattern in my running because he was

16    looking back for me.

17    Q.    You saw him glancing over one of his shoulders

18    various times?

19    A.    Correct.  His left shoulder.

20    Q.    And did you have anything in your hands during this

21    portion of the foot pursuit?

22    A.    I believe when we started heading west on Cactus, he

23    switched his primary hand to the front of his waistband from

24    his left to his right.  And so at that point because he was

25    favoring his left shoulder, I really believed that he might

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 38

1  have a gun, and therefore, I pulled out my gun and turned on

2  my strobe light.

3      Q.   Is that once he started turning west, or is that

4  before that?

5      A.   It would be right around the area he started to head

6  west.

7      Q.   So the initial part of the pursuit when he was going

8  south, did you have anything in your hands at that point?

9      A.   No.  I believe maybe just my flashlight.

10     Q.   Are you right-handed or left-handed?

11     A.   I'm a right-handed person.

12     Q.   Were you illuminating him with your flashlight as

13  you were running after him in the southbound direction?

14     A.   Yes, sir.  Initially.

15     Q.   And during that time did he ever turn towards you

16  with an object in his hands?

17     A.   He had turned towards me, again, with looking over

18  his left shoulder, but he didn't -- I didn't see any objects

19  in his hands because there was always one hand in front of

20  his person.

21     Q.   Did you ever consider tactically maybe not pursuing

22  him on foot given that you were alone and it was another

23  driver in the vehicle?

24     A.   I did consider it, but it was a rapidly-evolving

25  situation, and again, based on his posturing and my initial

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 39

1  contact with him, I thought it would be -- I thought it was a

2  better move to pursue him.

3     Q.    So you considered it, but you thought it would be

4  better to pursue him?

5     A.    Correct.

6     Q.    And so once he turned in a westerly direction,

7  that's about the time you pulled out your firearm?

8     A.    Approximately.

9     Q.    Did he ever say, "I will shoot you" before you

10  pulled out your firearm?

11     A.    I don't recall if I pulled out my firearm when he

12  switched to his right hand or when he said, "I will shoot

13  you" the first time.  But it was one of those two things that

14  really led me to believe he had a gun, and that's when I

15  pulled out my firearm.

16     Q.    Okay.  And then you continued to pursue him, but

17  more in a westerly direction?

18     A.    Correct.

19     Q.    So do you think during that portion of the pursuit,

20  he ever looked over his shoulder and saw you with a gun in

21  your hand?

22        MS. ANDERSEN:  Objection.  To the extent that calls

23  for speculation.

24        You can answer.

25  BY MR. GALIPO:

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 40

1    Q.   Yeah.  If you know.

2    A.   I don't know if he would have had any knowledge of

3    me having a gun, but I had my strobe light on.  So I don't

4    know if he was able to identify me having a gun.

5    Q.   And the strobe light, was that like a tac light on

6    your firearm?

7    A.   Correct.

8    Q.   Was he looking back at you various times when he was

9    running in a west direction?

10   A.   Yes.

11   Q.   And how often was he looking back at you during that

12   time frame?

13   A.   It was pretty often.  I would say every five yards

14   or so, he would change his direction of travel to, you know,

15   a diagonal version of travel to the other opposite end, and

16   he was always looking for me over his left shoulder.  So --

17   Q.   Okay --

18   A.   Sorry.

19   Q.   And do I have it correct that he traveled

20   approximately 60 to 80 yards in a west direction before the

21   shooting occurred?

22   A.   Again, it's an approximation, but yes.

23   Q.   And during that time frame you're estimating that he

24   said, "I will shoot you" or words to that effect

25   approximately ten times?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 41

1    A.    Correct.

2    Q.    The first time he said it, did you see any weapon in

3  his hand at that point?

4    A.    No.

5    Q.    Did he turn towards you with an object that you

6  could see at that point?  In other words, did it look like he

7  was turning towards you to shoot you after he said it the

8  first time?

9    A.    No.

10    Q.    And how about the second time, when he said it the

11  second time, could you see an object in his hands, or did it

12  look like he was turning to shoot you?

13    A.    No.

14    Q.    And if I went through each time up to the last time,

15  the third time, the fourth time, the fifth time, the sixth

16  time, the seventh time, the eighth time, the nineth time, and

17  asked you each one of those times whether he turned towards

18  you with an object in his hand and looked like he was going

19  to shoot you at those times, would your answer be the same;

20  no, not those times?

21    A.    Correct.  Up to the nineth time like you had said.

22    Q.    Okay.  So approximately nine times he said, "I'm

23  going to shoot you," and during those times you would at

24  least agree you did to the see an object in his hands, and it

25  did not appear that he was turning to shoot you during those

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 42

1    nine times; is that fair?

2        A.   Yes, sir.

3        Q.   And you were still running after him at about 30

4    feet behind him?

5        A.   Correct.

6        Q.   Now, you were giving him some commands as you were

7    chasing him westbound?

8        A.   Yes, sir.

9        Q.   Do you recall some of the commands you were giving

10   him?

11       A.   Yes, sir.  It was along the lines "let me see your

12   hands," and I believe I told him to get his hands off his

13   waistband as well.

14       Q.   Did you ever give him a verbal warning that you were

15   going to shoot him?

16       A.   I do not believe so.

17       Q.   Up to the last time that he said, "I will shoot

18   you," did you see any object in his hand at all?

19       A.   You're not including the last time?

20       Q.   Up to that time, and then I'll ask you about the

21   last time.

22       A.   Correct, sir.  I did not see anything in his hand up

23   to the last time.

24       Q.   Let's talk about the last time.

25            And I think I asked you before how much time passed

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 43

1    between the last time he said, "I will shoot you" and the

2    shots, and I think it was difficult for you to give an

3    estimate?

4        A.    Correct.

5        Q.    Did you say anything to him after the last time he

6    said, "I'll shoot you," but before the shots?

7        A.    I don't recall.

8        Q.    Was he running still away from you the last time he

9    said, "I will shoot you?"

10        A.    Was he running away from me the last time he said,

11    "I'll shoot you?"

12            Is that what you're asking?

13        Q.    Yeah.  That's my question.

14        A.    Yes, sir.  He was still heading away from me.

15        Q.    So he was still running west away from you the last

16    time he said, "I'll shoot you?"

17        A.    Correct.

18        Q.    And you were still generally looking at his back?

19        A.    The last time he said that?

20        Q.    Yes.

21        A.    Yes, sir.

22        Q.    Was his pace about the same, or did he appear to be

23    going faster or slowing down?

24        A.    Towards the end of the pursuit it was a very

25    sporadic in pace.  He would slow down and then speed up

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 44

1  because of his -- because of his continued looking over his

2  shoulder, the last couple of turns were more -- not the last

3  couple turns, but some of the turns towards the end of the

4  incident were more of a bladed stance where he was turning

5  even more.  He was more of turning rather than just a looking

6  over the shoulder.

7      Q.   How many times did he do more of a turning motion

8  rather than just looking over the shoulder motion?

9      A.   Approximately two.

10     Q.   And when he did those, did you see any object in his

11  hand?

12     A.   No.  Except for the last time.

13          The last time would have been the third.

14     Q.   So the movement he made the last time, he had made a

15  similar movement two prior times?

16     A.   Similar, but more exaggerated.

17     Q.   And the last time, did you see some type of an

18  object?

19     A.   Yes.

20     Q.   And where was this object?

21     A.   It was about at waist level, and it was being held

22  his by right hand.  So I was getting his full left-hand side,

23  and I saw the black object at waist level on his right

24  hand.

25     Q.   And you've already told me you did not specifically

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 45

```
 1   identify it as a firearm; correct?

 2       A.   Yes, sir.

 3       Q.   Did you say, "drop it" or words to that effect?

 4       A.   I did not, sir.

 5       Q.   Did the object look to you like it could possibly be

 6   a cell phone?

 7       A.   No.  To me at the time it looked -- I believed it to

 8   be a gun because of the circumstances.

 9       Q.   I'm just wondering in terms of its shape or size,

10   whether it also looked like a cell phone, possibly.

11       A.   I did not stare at it long enough to positively

12   identify it as a firearm.  I just -- based off the totality

13   of the circumstances and the way he was carrying it, I

14   believed it to be a gun.

15       Q.   How long did you see this object before you fired?

16       A.   The second I saw it coupled with his turning motion

17   towards me, that's when I decided to fire.  So it was no more

18   than a second that object was being presented to me that I

19   decided to shoot.

20       Q.   And when you were firing were you using your

21   sights?

22       A.   Yes, sir.

23       Q.   Could you see where the object was during the time

24   you were firing?

25       A.   No, sir.
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 46

1    Q.   So altogether you would have seen the object for

2    about a second or a fraction of a second?

3    A.   Yes, sir.

4    Q.   And as you were firing your shots, was Mr. Holland

5    still moving away from you?

6    A.   He was -- so again, he was bladed towards me with

7    his left side, and it was more of a side-step that he was

8    doing.  So yes, he was still moving away from me, just not in

9    the way he was doing the entirety of the pursuit.

10    Q.   So he was still moving away from you, but he had

11    turned some.  So his left side was more directed to you?

12    A.   Correct.

13    Q.   I think you've already told me early on, and I

14    apologize I don't see it in my notes.

15         Can you tell me again how many shots you fired?

16    A.   Six.

17    Q.   And was he moving -- continuing to move away from

18    you for all six shots?

19    A.   I don't know.

20    Q.   Did you see him going to the ground at some point?

21    A.   Yes, sir.  I -- that's when I stopped shooting is

22    when he went to the ground.

23    Q.   And how did he go to the ground, if you recall?

24         Was he chest-down or in some other position?

25    A.   I believe it was chest-down or on his side,

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 47

```
 1   something of that nature.
 2       Q.   And do you recall which way generally his head was
 3   and his feet?
 4       A.   His head would have been in a westward direction and
 5   his feet in a eastward.
 6       Q.   So his head was more in the direction he was
 7   running?
 8       A.   Correct.
 9       Q.   So immediately after the shooting when the deputy
10   asked you, "Do we have a gun," why did you say, "I don't
11   know" as opposed to "yes" or "I think he has a gun?"
12       A.   Because at that time when he was faced down, I
13   didn't know where the gun was.   I believe he asked me where
14   is the gun, and if that's --
15       Q.   You don't remember he had --
16       A.   I'm sorry.
17       Q.   I'm sorry.
18       A.   I said if that's not exactly what he asked me,
19   that's how I interpreted the question.
20       Q.   I see.  You don't recall him saying, "Do we have a
21   gun?"
22       A.   Something along those lines.  I remember him asking
23   me that question, yes.
24       Q.   And do you recall saying, "I don't know?"
25       A.   Yes.
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 48

1    Q.   Did you ever tell him that he has a gun?

2    A.   Did I tell my partner that he had a gun?

3    Q.   Yeah.  He has a gun, or something, or words to that

4    effect?

5    A.   Yeah.  I reiterated how Holland told me he had a

6    gun.

7    Q.   Well, isn't what you actually said, "He said he's

8    going to shoot me?"

9    A.   Correct, sir.

10    Q.   I know it might be -- you would agree what you said

11    is, "He said he was going to shoot me."

12          You didn't say that Holland told you he had a gun;

13    is that fair?

14    A.   Correct.

15    Q.   And in all fairness, Holland never specifically told

16    you he had a gun; he just said he was going to shoot you.

17    A.   That's correct.  But I saw during the pursuit what I

18    believed to be a gun at the moment of him turning.

19    Q.   Okay.

20          MR. GALIPO:  We've been going for awhile.

21          Thank you, Renee.  We can take this photo down.

22          I think it's a good time for a break.

23          We're making really good progress.

24          So that's good news.

25          Is ten minutes good for everyone?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 49

```
 1              COURT REPORTER:  That's fine.

 2              MR. GALIPO:  Let's go off the record.

 3              (Recess taken.)

 4    BY MR. GALIPO:

 5         Q.    To your knowledge, had you ever seen Mr. Holland

 6    before?

 7         A.    No, sir.

 8         Q.    Did you have any information that he had a criminal

 9    record?

10         A.    No, sir.

11         Q.    Any information that he had ever committed an act of

12    violence against anybody?

13         A.    No, sir.

14         Q.    Had you been in foot pursuits before that date?

15         A.    Yes, sir.

16         Q.    How many, approximately?

17         A.    Over ten.

18         Q.    Had you ever seen a suspect with an actual firearm

19    in their hand before?

20         A.    In my own experience, or --

21         Q.    Yeah.  Your experience, a suspect as opposed to a

22    fellow officer.

23         A.    No.

24         Q.    And did you have a body-worn camera at the time?

25         A.    No, sir.
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 50

1    Q.   Do you have them now?

2    A.   Yes, sir.

3    Q.   When did you get them, approximately?

4    A.   I believe it was the end of the last year.

5         So around November, December of 2023.

6    Q.   What was the source of the audio that we're

7  listening to regarding the event?

8    A.   It was my department-issued digital audio

9  recorder.

10   Q.   Were you aware it was on during the incident?

11   A.   Yes, sir.  I activated it.

12   Q.   Did you initially have the impression when

13 Mr. Holland was running southbound on the shoulder that he

14 was trying to get away from you?

15        MS. ANDERSEN:  Objection to the extent that calls

16 for speculation.

17        You can answer.

18        THE WITNESS:  Can you re-ask that question, please?

19 BY MR. GALIPO:

20   Q.   Sure.  When Mr. Holland got out of the car and was

21 initially running southbound before we went in an westerly

22 direction, was it your impression that he was trying to run

23 away from you?

24        MS. ANDERSEN:  Same objection.

25        THE WITNESS:  It was my impression, yeah, he was

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 51

1  trying to evade his detention.

2  BY MR. GALIPO:

3      Q.   And when he was running westbound, was it also your

4  impression that he was trying to get away from you?

5      A.   Yes, sir.

6      Q.   Now, the first nine times approximately that he

7  said, "I will shoot you" or words to that effect, and he

8  didn't shoot you, and you didn't see a gun or an object, did

9  you consider in your mind maybe he's just telling me he's

10  going to shoot me so that I'll stop chasing him?

11      A.   That never crossed my mind.

12          MS. ANDERSEN:   A late objection to the extent that

13  calls for speculation.

14          Sorry.

15  BY MR. GALIPO:

16      Q.   That never crossed your mind that he might just be

17  saying that so that you would stop chasing him?

18      A.   No, sir.

19      Q.   After he said -- and I think you told me earlier

20  that he ran about 60 or yards in between the first time he

21  said, "I'll shoot you" and the last time?

22      A.   Correct.

23      Q.   After he said, "I'll shoot you" the first time, did

24  you try to seek cover?

25      A.   No, sir.  I was in the middle of the dessert or an

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 52

 1   open roadway.  There was no cover near me.

 2       Q.   Did you decide to stop chasing him at that point?

 3            In other words, it might not have been worth it

 4   given the situation?

 5       A.   No, sir.  I never considered that because when he

 6   started heading westbound on Cactus he was heading towards a

 7   residential neighborhood.

 8       Q.   And I guess the second time he said it, you also did

 9   not decide; you didn't seek cover because there really was no

10   cover around?

11       A.   Correct.  Not even concealment.

12       Q.   Didn't you think that was a little odd, someone

13   saying, "I'm going to shoot you" nine times and never seeing

14   an object, and them never trying to shoot you?

15       A.   No.  I think he was in a very disadvantageous

16   position, and that's why he had not presented the firearm

17   yet, and I was at that point I already knew I had more of an

18   advantageous position due to his back being towards me and

19   him having to make a full turn before him having to shoot at

20   me.

21       Q.   Do you know if he -- do you believe now that the

22   object in his hand was a cell phone?

23            MS. ANDERSEN:  Objection to the extent that calls

24   for speculation.

25            But you can answer.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 53

```
 1              THE WITNESS:  I'm sorry.  Ask that question again?

 2   BY MR. GALIPO:

 3        Q.   Sure.  Do you believe now that the object you saw in

 4   his hand was a cell phone?

 5        A.   I know now that the object that I saw was a cell

 6   phone.

 7        Q.   How do you know that it was a cell phone as opposed

 8   to a firearm?

 9        A.   Based on the DOJ's investigation in the report that

10   was provided to me.

11        Q.   Well, after the shooting did you see any guns on the

12   ground or around his body?

13        A.   No, sir.

14        Q.   Do you know if he was searched or patted down for

15   weapons?

16        A.   Yes, sir.  I patted him down before I started giving

17   him aid.

18        Q.   Did you pat him down before or after the responding

19   deputy asked you whether or not he had a gun?

20        A.   After.

21        Q.   So when you said, "I don't know" that was before you

22   had patted him down; is that fair?

23        A.   Correct.

24        Q.   And so when you patted him down, did you find any

25   weapons on his person?
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 54

```
 1      A.   No, sir.

 2      Q.   Did you check his pockets?

 3      A.   Yes, sir.  I checked his entire body for any weapons

 4   that may be on him.

 5      Q.   Did you take anything out of his pockets at that

 6   point?

 7      A.   I don't believe so.

 8      Q.   Did you see a cell phone at some point?

 9      A.   There was a cell phone near his body.

10      Q.   Where was it in relation to his body?

11      A.   I would be guessing, but it was somewhere within

12   arms' reach, I believe.  I want to say it was close to his

13   head.

14      Q.   As he was -- well, let's back up.

15           You did not see the cell phone when he was in the

16   car; is that true?

17      A.   That's true.

18      Q.   And you did not see a cell phone when he was getting

19   out of the car; is that also correct?

20      A.   That's correct.

21      Q.   When he was running southbound on the shoulder, you

22   didn't see a cell phone at that time; correct?

23      A.   Correct.

24      Q.   And when he was running up until the last time he

25   said, "I'll shoot you" or words to that effect, you did not
```

A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Justin Lopez on 04/11/2024

Page 55

```
 1   see the cell phone; is that also correct?

 2       A.   Excluding the last time, correct.

 3       Q.   So what I'm wondering is, do you know whether or not

 4   he had the cell phone in his hand while he was running up to

 5   the last time as opposed to taking it out of a pocket or

 6   something?

 7       A.   The object I saw was what I believed to be a gun.

 8            So being that it was the only black object near his

 9   body, I put together that it was probably what he was

10   presenting to me during that turn that led me to believe or

11   know that he was armed at that point.

12       Q.   Right.  My question's a little bit different.

13            I think you told me, you know now for sure the

14   object in his hand was a cell phone.

15       A.   Correct.

16       Q.   And I'm just -- I think you told me that you did not

17   see any object in his hand before he said, "I will shoot you"

18   the last time.

19       A.   Correct.

20       Q.   Okay.  What I was asking you is, do you know now

21   whether he was running the whole time with that object in his

22   hand, or whether you observed him take it out of one of his

23   pockets shortly before the shooting.

24       A.   No.  I do not know whether or not he was, again,

25   yeah, the same answer.
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 56

1    Q.   So you don't know whether he had it in his hands the

2    whole time while he was running or not?

3    A.   No.  I only know that he had one hand in front of

4    him at all times.

5    Q.   So now we're up to the last time he said, "I'll

6    shoot you."

7         Did you see this object in his hand while he was

8    saying that or immediately after he was saying that for the

9    last time?

10   A.   I don't recall if he was saying it while he was

11   turning, or if it was prior to.

12        So I can't accurately answer that.

13   Q.   And how much of a -- you said he was running kind

14   of -- I forget the word, but kind of in a zigzag or haphazard

15   fashion?

16   A.   Yes.  Throughout the duration of the pursuit, it was

17   very irregular in his path.

18   Q.   And it sounds like when he was running southbound,

19   he looked over his shoulder multiple times at you.

20   A.   No.  It was when he was -- we were going westbound

21   on Cactus -- I'm sorry -- correct, he was looking over his

22   shoulder the entire pursuit.

23        I thought you were referring to the turns.

24        The turns he had made prior to the shooting were

25   when he were going west on Cactus.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 57

1          My apologies.

2     Q.    That's okay.  I just want make sure I'm

3  understanding what you're saying and I have it correct.

4          As he was going southbound, he looked over his

5  shoulder various times, but did not turn towards you while

6  going southbound; is that correct?

7     A.    Correct.

8     Q.    But when he was going westbound, he slightly turned

9  towards you on two prior occasions?

10    A.    Correct.

11    Q.    But during those prior occasions, you did not see

12  the object?

13    A.    Correct.

14    Q.    So the last time when he turned towards you, that

15  would have been the third time?

16    A.    Correct.

17    Q.    And that time you did see the object?

18    A.    Yes.

19    Q.    And would it have been in his left hand?

20    A.    No.  It would have been in his right hand.

21    Q.    The object was in his right hand?

22    A.    Yes, sir.

23    Q.    Did you see anything in his left hand?

24    A.    No.  It was being swung around his body as he was

25  turning to the side.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 58

1    Q.   And how far into the turn do you think he got before

2    you started shooting?

3    A.   I had his left shoulder completely, and his hands in

4    front of him.  So he was at probably a 90-degree angle turn

5    towards with his left side towards me if that makes sense.

6    Q.   So if he was like at 12 o'clock and you were at 6

7    o'clock, are you saying he would have been turned towards 9

8    o'clock?

9    A.   Correct.

10   Q.   Did he ever extend his right arm towards you?

11   A.   No.

12   Q.   Was he ever facing directly at you at any time

13   immediately before you fired or during the shots?

14   A.   His --

15       MS. ANDERSEN:  Sorry.  Objection.  Vague and

16   ambiguous as to directly at you.

17       But you can answer.

18       MR. GALIPO:  Yeah, that was.  Let me rephrase.

19   BY MR. GALIPO:

20   Q.   I was talking about his upper body as opposed to his

21   face.

22       Was his upper body ever directly pointed at you

23   immediately before or during the shots?

24   A.   No.

25   Q.   So you would have been shooting, it sounds like, at

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 59

1    his left side?

2          A.    Correct.

3          Q.    So would you at least agree that you never saw him

4    like in a shooting stance, would you agree with that?

5          A.    No.  I never saw him in a shooting stance.

6          Q.    And you think you saw this object in his right hand

7    for a second or a fraction of a second before you fired?

8          A.    Correct.

9          Q.    Do you know at the time you saw the object whether

10   it was illuminated by your light?

11         A.    The light was on, so yes.  That's why I would have

12   seen that black mass.  I think otherwise, I wouldn't have

13   been able to see it.

14         Q.    Now, the phone that you saw after the incident, do

15   you recall what color it was?

16         A.    Black.

17         Q.    Do you recall what type of phone it was,

18   generally?

19         A.    No, sir.  I mean like a touch screen type phone.

20               It wasn't a flip phone or anything like that.

21         Q.    And I think you already told me this, but when you

22   saw that the black object for a second or a fraction of a

23   second, you did not specifically see a barrel or a trigger or

24   a trigger guard or anything like that; is that correct?

25         A.    That's correct, sir.  I didn't take the time to

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 60

1  specifically identify any parts of a gun or what I believed

2  to be the gun.

3      Q.   After you patted him down, searched him for weapons,

4  was he handcuffed?

5      A.   Yes.  It's kind of a standard procedure to handcuff

6  the suspect prior to because you don't know what they do have

7  on them, and if they're going to, you know, attack officers

8  after coming to or whatever may be.

9           So he was handcuffed, and then we proceeded to pat

10 him down, and then once that was done, we started rendering

11 aid.

12     Q.   When you patted him, how much time do you think

13 passed in between the shooting and the pat-down?

14     A.   I had to wait for backup to show up.

15          It might have been somewhere around half a minute.

16     Q.   And was he still alive, if you can tell, when you

17 patted him down?

18     A.   Yes, sir.

19     Q.   How could you tell he was still alive?

20     A.   There was still rise and fall of his chest.

21     Q.   And when he was handcuffed, was he still alive?

22     A.   I don't know.  I believe because his body was moving

23 around at that point, I no longer had sight of his chest

24 rising and falling or could hear him breathing.

25          So I don't know if he was alive at that point.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 61

1    Q.   Did you handcuff him or someone else?

2    A.   I cuffed him.

3    Q.   And then was he chest-down at that point?

4    A.   When I handcuffed him?

5    Q.   Yes.

6    A.   Yes, sir.

7    Q.   Did you check for injuries?

8    A.   Yes, sir.  So once I handcuffed him, we turned him

9    over onto his back so he would be resting on his arms, and we

10   started to -- started our primary assessment of his

11   injuries.

12   Q.   And what did you see in that regard, if you

13   recall?

14   A.   I remember looking for holes in the upper thoracic

15   area where I was aiming.  I just saw a lot of blood.  I

16   couldn't identify any specific holes, and then I -- my

17   sergeant was there at the time, and he pointed out that he

18   had a head wound, and that's all I remember seeing at that

19   point.

20   Q.   Did you, in fact, see a head wound at some point?

21   A.   Yes, sir.

22   Q.   That was after the sergeant pointed it out?

23   A.   Correct.

24   Q.   And regarding his upper body, you recall a lot of

25   blood?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 62

1      A.    Yes, sir.

2      Q.    Did you ever try to look in the surrounding area for

3    a gun?

4      A.    I did a very quick scan of the area, and we were

5    somewhat near some dessert shrubbery I guess you could say,

6    and looked there real quickly.

7            But no, at the point I was told to walk away and

8    take a breath by my sergeant.

9      Q.    When you saw the cell phone after the shooting,

10    obviously, you recognized it as a cell phone after the

11    shooting?

12      A.    Yes, sir.

13      Q.    Okay.  It didn't look like a gun to you after the

14    shooting, did it?

15      A.    No, sir.

16      Q.    When you saw that cell phone after the shooting, did

17    you kind of put two and two together in your mind, and think

18    that's must have been what he was holding?

19      A.    Yeah, yes, sir.  After searching the area real quick

20    to see if I maybe missed the gun, that's when I put two and

21    two together, that that was probably what he was holding.

22      Q.    Did you see any object falling from him as he was

23    going to the ground?

24      A.    No, sir.

25      Q.    Did you tell anybody at the scene before you left

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 63

 1    that you believe he had a cell phone in his hand when you

 2    shot him?

 3        A.   No, sir.

 4        Q.   Did you tell anyone at the scene that you thought he

 5    had gun in his hand when you shot him?

 6        A.   Only my partner when he arrived on-scene, and then

 7    that would be it.  My sergeant asked for a public safety

 8    statement, how many rounds were fired and what direction, but

 9    that was it.

10        Q.   You think you told your partner that he had a gun in

11    his hand when you shot him?

12        A.   No, sir.  Let me reiterate that.

13             The partner that arrived on-scene and said, "where

14    is the gun, do we have a gun," I told him, "I don't know

15    where it's at, but he said he was going to shoot me."

16             And then that was it.  That was the only information

17    I had provided anybody.

18        Q.   Now, you've had some training, obviously, with

19    respect to the use of deadly force?

20        A.   Yes, sir.

21        Q.   That was both at the academy and your work in the

22    department?

23        A.   Yes, sir.

24        Q.   Were you trained that deadly force is the highest

25    level of force you can use?

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 64

1      A.    Yes, sir.

2      Q.    And were you trained it should only be used in

3   limited circumstances?

4      A.    Yes, sir.

5      Q.    And was that basically when there was an immediate

6   or imminent threat of death or serious bodily injury to

7   yourself or others?

8      A.    That's correct, sir.

9      Q.    And were you trained that you should not use deadly

10   force if there is not an immediate or imminent threat of

11   death or serious bodily injury?

12      A.    Yes, sir.

13      Q.    Were you generally trained that you should only use

14   deadly force if there are no other reasonable options?

15      A.    Yes, sir.

16      Q.    And were you trained to give a verbal warning before

17   using deadly force when feasible?

18      A.    When feasible, yes, sir.

19      Q.    Were you trained that you are responsible to justify

20   each shot when using deadly force?

21      A.    Yes, sir.

22      Q.    Do you recall training with respect to the concept

23   of reverence for human life?

24      A.    Yes, sir.

25      Q.    And was it your training generally that if you're

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 65

1  shooting someone center mass, it's likely to cause death or

2  serious bodily injury to that person?

3      A.   Yes, sir.

4      Q.   Where did you go from the scene of the incident?

5      A.   I was taken by one of my partners to the Adelanto

6  Station.

7      Q.   And how long were you there for, approximately?

8      A.   Many hours.  I want to say maybe five hours, four to

9  five hours.

10     Q.   What were you doing there during that time?

11     A.   I was being tended to by my partners.

12          They offered me food, water, kind of just stood by

13  with me until the Homicide Investigations Team and the DOJ

14  arrived.

15     Q.   Did the DOJ arrive during the time you were there

16  for that four or five hours?

17     A.   Yes, sir.

18     Q.   And did you have a representative there during that

19  time?

20     A.   Yes, sir.

21     Q.   And was it decided during that time frame you were

22  not going to give a statement?

23          MS. ANDERSEN:  Objection to the extent that calls

24  for information protected by the attorney-client privilege

25  with his criminal attorney.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 66

1          So without disclosing anything that was discussed

2     between him and his attorney, I'll allow him to answer that

3     question.

4          THE WITNESS:  Based on the advice of my counsel, I

5     made the decision not to make a statement.

6          MR. GALIPO:  Okay.  I think I'm just about done.

7          I would like to take one last break for five or

8     seven minutes, and then we can finish it up.

9          MS. ANDERSEN:  That works.

10          (Recess taken.)

11    BY MR. GALIPO:

12     Q.    In foot pursuit situations, did you have some

13    training on setting up perimeter or containment?

14     A.    Yes, sir.

15     Q.    And you communicated you were in a foot pursuit;

16    correct?

17     A.    Yes, sir.

18     Q.    And that's part of your training?

19     A.    Yes, sir.

20     Q.    To let dispatch know you're in a foot pursuit, but

21    also to let fellow officers know?

22     A.    Yes, sir.

23     Q.    So that they could potentially come and assist?

24     A.    Correct.

25     Q.    And how long was it after the shooting until you saw

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 67

 1    another officer on-scene?

 2        A.    Somewhere around 30 seconds before somebody arrived

 3    on-scene.

 4        Q.    Were you aware that officers were in route, or did

 5    you anticipate that because you communicated foot pursuit?

 6        A.    I anticipated because I put out that one was running

 7    and I was pursuing.

 8        Q.    Did you ever consider while you were chasing him

 9    after he said, "I will shoot you" creating a little more

10    distance but keeping him in sight and waiting for backup

11    units to arrive?

12        A.    I'm sorry.  Can you ask that again?

13        Q.    Sure.  When you were chasing him and he started

14    going, you know, westerly direction, and then said, "I will

15    shoot you" multiple times, did you consider that he might

16    have a gun?

17        A.    Yes, sir.

18        Q.    And at that point did you consider tactically maybe

19    I should distance myself a little bit and keep him in sight

20    and wait for the backup units to get there so we can, you

21    know, put together a tactical plan?

22        A.    No, sir.  Because of the direction he was heading.

23              He was heading towards a residential neighborhood,

24    and I didn't want to give up the ground or my distance to

25    him.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Justin Lopez on 04/11/2024

Page 68

1    Q.   How close do you think he was to the residential

2    neighborhood at the time of the shooting?

3    A.   He was coming up on the corner that you would have

4    to turn on.  So I want to say it was maybe -- it was maybe 50

5    or 60 yards away from us further west.

6    Q.   Did you ever communicate over your police radio that

7    you thought he had a gun before the shooting?

8    A.   No, sir.

9    Q.   Did you ever communicate over your police radio that

10   you thought he had a gun after the shooting?

11   A.   No, sir.

12   Q.   Okay.  I think that's all the questions I have.

13        MR. GALIPO:  Kayleigh, do you have any questions

14   today?

15        MS. ANDERSEN:  Very few.

16        MR. GALIPO:  Okay.

17                     EXAMINATION

18   BY MS. ANDERSEN:

19   Q.   Deputy Lopez, what name did the passenger and the

20   vehicle give you during your initial traffic stop?

21   A.   He gave me the name of Andy Atkins or Andrew I

22   believe he clarified it as.

23   Q.   During the foot pursuit what did you refer to him

24   as?

25   A.   Atkins.

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 70

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3   Case Name:  Shane Holland, et al. vs. County of San

 4   Bernardino, et al.

 5   Date of Deposition:  April 11, 2024

 6   Job No.:  62323

 7

 8             I, _____, hereby certify

 9   under penalty of perjury under the laws of the State of

10   California that the foregoing is true and correct.

11             Executed this _____ day of _____,

12   20____, at _____, California.

13

14

15

16

17

18                     _____

19                          JUSTIN LOPEZ

20

21

22

23

24

25
```

**A.H. AND H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Justin Lopez on 04/11/2024**

Page 71

```
 1                           CERTIFICATE

 2                               OF

 3              CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5              I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6    Stenographic Shorthand Reporter of the State of California,

 7    do hereby certify:

 8              That the foregoing proceedings were taken before me

 9    at the time and place herein set forth;

10              That any witnesses in the foregoing proceedings,

11    prior to testifying, were placed under oath;

12              That a verbatim record of the proceedings was made

13    by me, using machine shorthand, which was thereafter

14    transcribed under my direction;

15              Further, that the foregoing is an accurate

16    transcription thereof.

17              I further certify that I am neither financially

18    interested in the action, nor a relative or employee of any

19    attorney of any of the parties.

20

21              IN WITNESS WHEREOF, I have subscribed my name, this

22    date:  April 11, 2024.

23              _____

24              Jinna Grace Kim, CSR No. 14151

25
```