# EXHIBIT 3

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.H., et al,

 5                  Plaintiffs,

 6        vs.                           Case No.: 5:23-cv-01028-JGB-SHK

 7   COUNTY OF SAN BERNARDINO, JUSTIN
     LOPEZ, and DEOS , inclusive,
 8
                    Defendants.
 9   _____

10        AND ALL RELATED CROSS-ACTIONS.

11   _____

12

13                    DEPOSITION OF MARK RIOS

14                       June 25, 2024

15                         12:45 PM

16

17        REMOTE DEPOSITION VIA TELECONFERENECE

18

19

20

21

22

23

24   REPORTED BY:
     ELIZABETH CHAE
25   CSR No. 14633
```

Page 2

```
 1   APPEARANCES:

 2   For Plaintiffs:

 3
             LAW OFFICES OF DALE GALIPO
 4           BY: RENEE V. MASONGSONG
             21800 Burbank Boulevard,
 5           Suite 310.
             Woodland Hills, CA
 6           91367
             818.347.3333
 7           rvalentine@galipolaw.com

 8

 9   For Defendants:

10           MANNING & KASS
             ELLROD, RAMIREZ, TRESTER LLP
11           BY: KAYLEIGH ANDERSON, ESQ.
             801 Figueroa Street
12           15th Floor.
             Los Angeles, CA.
13           90017
             kayleigh.andersen@manningkass.com
14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1                          INDEX
 2
 3   WITNESS:  MARK RIOS
 4   EXAMINATION                                    PAGE
 5   BY RENEE V. MASONGSONG                            4
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 14

1     A.  Yes, ma'am.
2     Q.  And at some point did you decide to respond to
3  assist Deputy Lopez?
4     A.  Yes, ma'am.
5     Q.  And I imagine since you are the Watch
6  Commander, you made that decision yourself?  There
7  wasn't anybody else that assigned you to the call?
8     A.  No, ma'am.  I made the decision.
9     Q.  And what was the particular reason that you
10  decided to respond?
11     A.  Due to a subject running from a deputy.
12     Q.  Okay.  And was it your understanding, if you
13  knew one way or the other, at the time of the incident
14  that Deputy Lopez was handling the incident on his own?
15     A.  Can you...
16     Q.  Yeah, I can clarify.  What I'm asking is, when
17  you heard the communication "one running", did you have
18  an understanding if Deputy Lopez was the only officer on
19  scene with that suspect at that time or whether he had a
20  partner officer with him?
21     A.  I had no idea if there was somebody with him or
22  he was by himself.  I was just listening to the traffic.
23     Q.  Okay.  Did you make any communications over the
24  radio indicating that you were going to respond to
25  assist Deputy Lopez?

```
 1   was -- and stood up as I was getting out of my vehicle.
 2        Q.  And at that time, when you're making this
 3   observation, did you see any civilians in the vicinity
 4   of Deputy Lopez or Mr. Holland?
 5        A.  I did not.
 6        Q.  Did you search Mr. Holland and some point?
 7        A.  Yes, ma'am.
 8        Q.  And was that pretty shortly after you arrived?
 9        A.  Yes, ma'am.
10        Q.  After you arrived on scene, but before you
11   searched Mr. Holland, did you ask any Deputy whether
12   anyone had already conducted a pat-down search of
13   Mr. Holland?
14        A.  I don't recall, ma'am.
15        Q.  Did you find any weapons on Mr. Holland's
16   person?
17        A.  I did not.
18        Q.  Did you ever observe any weapons in the
19   vicinity of Mr. Holland?
20        A.  I did not.
21        Q.  And that would obviously be other than the
22   deputies' weapons, just to clarify.  Do you know one way
23   or the other whether any weapons were found on
24   Mr. Holland's person after the shooting?
25            KAYLEIGH ANDERSEN:  Object to the extent it calls
```

Page 21

```
 1   for speculation, but you can answer.
 2            THE WITNESS:  I do not.
 3   BY RENEE MASONGSONG:
 4       Q.  Did you observe a cell phone near Mr. Holland?
 5       A.  Yes, ma'am.
 6       Q.  And as far as you recall, where was that cell
 7   phone located in relation to Mr. Holland?
 8       A.  Ma'am, I believe it was approximately 3 feet
 9   east -- northeast from him.
10       Q.  And other than the cell phone, did you see any
11   other objects near Mr. Holland at that time?
12       A.  A hat.
13       Q.  When you first arrived on scene did you say
14   anything to Deputy Lopez?
15       A.  I believe Deputy Lopez asked me if I had a
16   trauma kit.
17       Q.  And after he asked you that, did you go get the
18   trauma kit?
19       A.  Yes, ma'am.
20       Q.  And other than that communication, did you have
21   any other conversation with Deputy Lopez outside of the
22   Public Safety Statement?
23       A.  No, ma'am.
24       Q.  At any point when you were on scene, did you
25   ever hear Deputy Lopez say that he saw a gun?
```

Page 22

```
 1        A.   No, ma'am.
 2        Q.   At any point when you were on scene, did you
 3   ever hear Deputy Lopez say that he needed to find a gun?
 4   And to clarify, to find a gun that may have belonged to
 5   the suspect.
 6        A.   Can you please re-ask that, ma'am?
 7        Q.   Yeah, yeah, I'm sorry.  That was kind of a
 8   clumsy question.  At any point when you're on scene, did
 9   you hear any communications from Deputy Lopez indicating
10   that the area needed to be searched for a gun?
11        A.   I don't recall him making that statement,
12   ma'am.
13        Q.   And I understand it that you took the Public
14   Safety Statement from Deputy Lopez that we referred to
15   earlier.  Was that before or after you searched
16   Mr. Holland?
17        A.   After.
18        Q.   And would that also be after any medical
19   treatment was provided to Mr. Holland, if you know?
20        A.   The paramedics arrived first, I believe, ma'am.
21   And then I took his statement.
22        Q.   And during the Public Safety Statement, did
23   Deputy Lopez tell you that he fired about five to six
24   rounds?
25        A.   Yes, ma'am.
```

Page 23

1   Q.  And at any point, did you ever learn how many
2   rounds were actually fired during the incident?
3       A.  I have not asked.  No, ma'am.
4       Q.  And during the Public Safety Statement, did
5   Deputy Lopez tell you that he was about seven yards away
6   from Mr. Holland when he fired his rounds?
7       A.  I don't recall exactly, ma'am, but I believe
8   that's roughly the estimate.
9       Q.  Okay.  And just a few more questions on this
10  point.  At any point when you were on scene, did you
11  ever hear Deputy Lopez say that Mr. Holland had turned
12  toward him?
13      A.  I don't recall, ma'am.
14      Q.  And do you recall ever hearing Deputy Lopez say
15  that Mr. Holland stated to him that he had a gun?
16      A.  Can you ask that again please, ma'am.
17      Q.  Sure.  At any point when you were on scene,
18  did you ever hear Deputy Lopez say that Mr. Holland told
19  him that he had a gun?
20      A.  Ma'am, I don't recall.  It was pretty crazy.  I
21  was trying to get people there, trying to make sure
22  everything was taken care of.
23      Q.  Understood.  As some point did you search for
24  some wounds or injuries on Mr. Holland?
25      A.  Yes, ma'am.

1       A.  Yes, ma'am.

2       Q.  Have you been trained as a peace officer that
3   deadly force can only be used when the officer has an
4   objectively reasonable belief that the suspect poses an
5   immediate threat of death or serious bodily injury?
6       A.  Yes, ma'am.

7       Q.  Have you received some training as a peace
8   officer that when it is feasible to do so, an officer
9   should give a verbal warning before using deadly force?

10      A.  Can you ask that again please, ma'am?

11      Q.  Sure.  Have you received some training that an
12  officer should give a verbal warning before using deadly
13  force when it is feasible to do so?

14      A.  I don't know that I completely understand that
15  question.  It's not always feasible to give a verbal
16  warning.

17      Q.  And in the context of your training with
18  respect to deadly force at the Academy, were you ever
19  told that you should tell the suspect that you're going
20  to discharge your weapon as a peace officer if it's
21  feasible to do so?

22      A.  No, ma'am.

23      Q.  Okay.  Do you have any training with respect to
24  foot pursuits?

25      A.  Yes, ma'am.

Page 32

1  STATE OF CALIFORNIA         )

2           I, ELIZABETH CHAE, Certified Shorthand Reporter,

3  in and for the State of California, Certificate No. 14633,

4  do hereby certify:

5           That prior to being examined, the witness named

6  in the foregoing deposition was by me first duly sworn to

7  testify to the truth, the whole truth, and nothing but the

8  truth.

9           That said deposition was taken before me at the

10 time and place therein set forth and were taken down by me

11 in shorthand and thereafter transcribed into typewriting

12 under my direction and supervision.

13          I further certify that I am neither counsel for,

14 nor related to, any party to said action, nor in any way

15 interested in the outcome thereof.

16          In witness whereof, I have hereunto subscribed
   my name.
17

18 Dated: June 25, 2024

19

20  *Elizabeth Chae* (signature)

21 _____
   ELIZABETH CHAE
22 CSR No. 14633

23

24

25