# EXHIBIT 4

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.H. and H.H., in each case a minor,  )
     by and through their guardian ad      )
 5   litem Crystal Hanson, individually    )
     and as successor in interest to Shane )
 6   Holland, deceased; C.H., a minor by   )
     and through her guardian ad litem,    )
 7   Reymi Updike; individually and as     )
     successor in interest to Shane        )
 8   Holland, deceased, and PATRICIA       )
     HOLLAND, individually,                )
 9                                         )
                  Plaintiffs,              )
10                                         )
                  vs.                      )Case No.
11                                         )5:23-CV-01028-JGB-SHK
     COUNTY OF SAN BERNARDINO; JUSTIN      )
12   LOPEZ, DOES 1-10, inclusive,          )
                                           )
13                Defendants.              )
     _____)

14

15

16

17           REMOTE VIDEOCONFERENCE DEPOSITION OF

18                  PHILLIP L. SANCHEZ

19              WEDNESDAY, AUGUST 21, 2024

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  96886
```

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 2

```
 1                    UNITED SATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4    A.H. and H.H., in each case a minor,  )
      by and through their guardian ad      )
 5    litem Crystal Hanson, individually    )
      and as successor in interest to Shane )
 6    Holland, deceased; C.H., a minor by   )
      and through her guardian ad litem,    )
 7    Reymi Updike; individually and as     )
      successor in interest to Shane        )
 8    Holland, deceased, and PATRICIA       )
      HOLLAND, individually,                )
 9                                          )
                    Plaintiffs,             )
10                                          )
                    vs.                     )Case No.
11                                          )5:23-CV-01028-SHK
      COUNTY OF SAN BERNARDINO; JUSTIN      )
12    LOPEZ, DOES 1-10, inclusive,          )
                                            )
13                    Defendants.           )
      _____)
14

15

16

17            The remote videoconference deposition of PHILLIP L.

18    SANCHEZ, taken on behalf of the Plaintiffs, beginning at

19    10:33 a.m., and ending at 12:21 p.m., on Wednesday, August

20    21, 2024, before Jinna Grace Kim, Certified Stenographic

21    Shorthand Reporter No. 14151.

22

23

24

25
```

Page 13

```
 1   to discharge.

 2       Q.   Okay.  Sorry.  I think your verbiage is much better

 3   than mine.  I'll stick with that for future questions --

 4       A.   -- perfect, sir.

 5       Q.   Okay.  And do you have an understanding of how many

 6   rounds struck the decedent in this case out of the six?

 7       A.   Yes.

 8       Q.   And what is your understanding?

 9       A.   My understanding is that four of the six rounds

10   struck Mr. Holland.

11       Q.   So I want to ask you just a few questions about the

12   standards that apply to the use of deadly force.  That's kind

13   of the next topic I would like to cover with you if that's

14   okay.

15       A.   Yes, sir.  Your pleasure.

16       Q.   And would you agree that deadly force is the highest

17   level of force a police officers can use?

18       A.   Yes.

19       Q.   And based on the training the expectation is if

20   you're shooting someone center mass with a firearm, it's

21   likely to cause serious bodily injury or dearth?

22       A.   Yes.

23       Q.   And would it be fair to say that officers are

24   trained that they should only use deadly force in limited

25   circumstances?
```

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 14

1    A.    Yes.  Based on the totality of the circumstances and

2    in compliance with the laws and policy.

3         Q.    And is it generally the training that an officer

4    must have a reasonable belief of an immediate or imminent

5    threat of death or serious bodily injury?

6         A.    Yes.

7         Q.    And just speaking about the threat level for a

8    moment, would you agree a potential threat or potential

9    deadly threat is not enough; the threat must be imminent or

10   immediate, and it must have be of death or serious bodily

11   injury?

12        A.    Yes.  I would add the perception of -- can -- the

13   peace officer can perceive that those facts actually exist

14   and in reality they may not.

15        Q.    Would you agree that the perception in terms of

16   analysis from an expert like yourself would have to be

17   reasonable, though?

18        A.    Yes.

19        Q.    Are officers trained that they should give a verbal

20   warning before using deadly force when feasible?

21        A.    When safe and feasible.

22        Q.    And are officers trained in terms of using deadly

23   force, they have to justify all their shots?

24        A.    Yes.

25        Q.    As a law enforcement officer in your career, had you

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 15

1    ever seen a suspect with a weapon in their hand before?

2        A.    Yes.

3        Q.    Would that include firearms?

4        A.    Yes.

5        Q.    And do you have an estimate as to how many times you

6    had seen a suspect with a firearm in their hand before in

7    your career?

8        A.    I would say between 50 and 80 eighty times where I

9    physically saw the suspect was armed with a firearm.

10       Q.    Were you trained that you could simply shoot someone

11   for seeing a firearm in their hand?

12       A.    No.

13       Q.    Were you yourself involved in any officer-involved

14   shootings?

15       A.    Yes.

16       Q.    And how many, where you actually fired?

17       A.    Five.

18       Q.    And out of those five, how many of the individuals

19   had firearms in their hands, if you recall?

20       A.    I believe it was three.

21       Q.    So if I'm doing my math right, would it be fair to

22   say you saw some individuals with firearms in their hands

23   that you did not shoot?

24       A.    That's correct.

25       Q.    And then the other two times you fired, was there a

A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Phillip L. Sanchez on 08/21/2024

Page 18

1    Q.   What time frame were you there?

2    A.   From April 18, 1980 through April -- I'm sorry --

3    through July 12, 2010.

4    Q.   Are you familiar with the current POST Standards

5    about someone having the present ability, opportunity, and

6    apparent intent to immediately cause death or serious bodily

7    injury?

8    A.   Yes, sir.  I believe it's referred to as AOI.

9    Q.   And you're familiar that's part of the revised Penal

10   Code Section now, I think, 835?

11   A.   Yes, sir.

12   Q.   And also incorporated into the POST Learning Domain

13   on excessive force, I think, Learning Domain 20?

14   A.   That's correct, sir.

15   Q.   And would you agree that the POST Standards are fear

16   of future harm no matter how great or how likely, is

17   insufficient to use deadly force?

18   A.   I would agree.

19   Q.   So let's talk a little bit about your understanding

20   of the facts in this case, and then I might have you a few

21   questions about tactics as I go.

22        Is that all right?

23   A.   Yes, sir.  At your pleasure.

24   Q.   And this is not a complete memory test.  So if you

25   want to review your report or look at something, I'm going to

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 19

1    allow you to do that.  You can just tell us may I refer to

2    report to my report similar to how you do in court or just

3    let us know I'm looking at Page 5 of my report, for example.

4            Okay?

5    A.    Yes, sir.

6    Q.    Do you have an understanding from reviewing the

7    materials as to why the vehicle was initially stopped or

8    approached?

9    A.    Yes.

10    Q.    And what is your understanding?

11    A.    I believe that Deputy Lopez had told investigators

12    the night of the incident and then subsequently in deposition

13    that he saw a blue Chevy mid-sized SUV, and that the license

14    plate was in poor repair obscuring the characters and numbers

15    to the point that Deputy Lopez could not read them.

16            Additionally, that the license plate on the

17    mid-sized SUV was not affixed to the vehicle in what I would

18    call the normal place, the standard or routine place.  It was

19    near the upper-left rear tailgate area of the SUV.

20            Deputy Lopez then determined that he wanted to

21    affect a traffic stop and then followed his training and

22    protocol to do so.

23    Q.    If you recall, did the vehicle pull over?

24    A.    It did.

25    Q.    I think you would agree at least with me that this

A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Phillip L. Sanchez on 08/21/2024

Page 20

1    was not like a serious crime that the vehicle was being

2    pulled over for; is that fair?

3        A.    I believe that's accurate.  Both of the Deputy

4    Lopez's observations would have been infraction violations in

5    the California Vehicle Code.

6        Q.    And as part of the materials that you reviewed, did

7    you listen to the radio dispatch tape?

8        A.    I did.

9        Q.    And did you listen to any audio recording of the

10   incident?

11       A.    Yes.  That was captured by Deputy Lopez's belt

12   recorder.

13       Q.    Did you have an understanding as to whether or not

14   the deputies had body-worn cameras at the time?

15       A.    My understanding was that San Bernardino County

16   Sheriffs had not issued body-worn cameras at that point.

17       Q.    And is it your understanding there were two people

18   in the vehicle?

19       A.    Yes.

20       Q.    And is it your understanding that the decedent was

21   not driving, but in a passenger seat?

22       A.    Front, right passenger seat, yes.

23       Q.    And when you listened to the audio of the stop, did

24   you hear any discussion about the license plate with the

25   driver?

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 21

1    A.    Yes.

2    Q.    And do you recall from listening to the dispatch

3    tape if Deputy Lopez called in the stop?

4    A.    He did advise the communication center of his

5    location and the purpose of his stop.

6    Q.    And would you agree that Deputy Lopez had no

7    information that there were any weapons in the car, for

8    example, would you agree?

9    A.    Yes.

10    Q.    And would you agree he did not see any weapons in

11    the car?

12    A.    Yes.

13    Q.    He had no information that the individuals in the

14    car had a prior criminal history, would you agree with

15    that?

16    A.    During the initial phases, that's correct.

17    Q.    Do you have any information that Deputy Lopez

18    learned of any criminal history of Mr. Holland before he shot

19    him?

20    A.    No.   I believe that the evidence that I reviewed in

21    case materials suggested that Deputy Lopez was attempting to

22    identify Mr. Hanson, the driver, and Mr. Holland who actually

23    had provided a false name.  I believe he said his name was

24    Atkins and provided a date of birth in May at some point.

25    Q.    And then eventually Mr. Holland gets out of the car

A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Phillip L. Sanchez on 08/21/2024

Page 23

1   perimter and containment.

2       Q.   Do you know whether or not Deputy Lopez asked for

3   assistance or backup at any point?

4       A.   He did not use that verbiage.  Contemporary training

5   in law enforcement suggest that when assisting officers, in

6   this case, Deputy Hillebrand and Sergeant Rios, when they

7   monitor a radio broadcast, in this case by Deputy Lopez who

8   said chasing one or foot pursuit verbiage of that kind, that

9   there are going to be a response at some point by the

10  assisting officers.

11      Q.   And do you have an understanding as to whether the

12  backup officers were in route after Deputy Lopez put out that

13  dispatch?

14      A.   My understanding is that Deputy Hillebrand told

15  investigators and then later in a deposition that he

16  monitored the radio broadcast and then started to drive

17  towards the area of Cactus Road and US 395 where the vehicle,

18  Mr. Hanson's had been stopped.

19           I believe that's Sergeant Rios who was at the patrol

20  station provided similar testimony that he monitored the call

21  and then did not initially respond, and then when heard the

22  radio broadcast on chasing one or foot pursuit, that

23  verbiage, that he left the station, entered the patrol

24  vehicle, and then drove towards Cactus Road and US 395.

25      Q.   And so one possibility getting the assistance of

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 24

1   additional officers is to set up a containment or

2   perimeter?

3       A.    That is a possibility.  Given the vastness of the

4   area out at 395 and Cactus Road, I did conduct a site visit.

5   I have a sense of what that area looks like given the absence

6   of either artificial or ambient light, a perimeter would

7   still be difficult with three law enforcement officers given

8   that area.

9       Q.    Just going back for a moment to the time that Mr.

10  Holland was in the vehicle, do you recall at some point

11  Deputy Lopez was at the passenger side of that vehicle?

12      A.    Yes, sir.

13      Q.    And according to Deputy Lopez, I think you've

14  already told me this; he didn't see any weapons on Mr.

15  Holland or in the vehicle at that time; is that fair?

16      A.    Yeah.  I believe that's fair.  He was in full

17  uniform, he explained the purpose of the stop, he asked

18  investIgaroty questions, and then he returned to his vehicle.

19      Q.    And there was no indication of any verbal threats to

20  him at that point; is that correct?

21      A.    Not threats.  I think Deputy Lopez indicated the

22  individual he thought was Atkins was nervous, avoiding eye

23  contact, but did not testify to seeing any weapons or threats

24  that were made directly at Deputy Lopez.

25      Q.    And what is your understanding as to where Deputy

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 25

1  Lopez was when Mr. Holland got out of the vehicle and started

2  to flee?

3       A.   The passenger side of his marked San Bernardino

4  County Sheriff's unit, my understanding is the passenger door

5  was open, and Deputy Lopez was conducting DMV and other

6  checks on his MDC, which stands for Mobile Data Computer.

7       Q.   Prior to Mr. Holland fleeing, do you think it would

8  have been appropriate to use any force on Mr. Holland prior

9  to him getting out of the car and fleeing?

10      A.   There would have been no need for or justification

11  for Deputy Lopez based just on the traffic stop.  The

12  avoidance by Mr. Holland, or AKA Atkins, would not have been

13  sufficient to use force.

14      Q.   And when Mr. Holland started running away, is it

15  your understanding he was going generally southbound at

16  first?

17      A.   Generally, yes, southeast, I think, parallel to

18  395.

19      Q.   And was his back generally to Deputy Lopez when he

20  initially started running away southbound?

21      A.   I believe Deputy Lopez testified that when Mr.

22  Holland exited the vehicle, his back was generally towards

23  Deputy Lopez.  However, he did look over his left shoulder

24  and initially had his hands at his waistband which was of

25  course concerning to Deputy Lopez.

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 26

1      Q.    Do you think it would have been appropriate based on

2   the facts, let's say up to the time that Mr. Holland starts

3   running away generally southbound, do you think it would have

4   been appropriate for Deputy Lopez to shoot him at that

5   time?

6      A.    No.

7      Q.    And why not, why not at that time?

8      A.    I think during as -- your hypothetical's a little

9   incomplete, but --

10     Q.    Let's say -- I'm sorry.  Just to clarify, because I

11  think it was incomplete, prior to him saying something to

12  Deputy Lopez just running away initially?

13     A.    I don't think running away initially would have

14  necessarily been justification for deadly force, although,

15  Deputy Lopez reported that almost immediately after Mr.

16  Holland had his hands at his waistband.

17          My experience as a professional law enforcement

18  officer has been that weapons are oftentimes concealed or

19  carried in what is commonly referred to as an appendix carry,

20  so in the waistband at the front of the torso or somewhere

21  along the extended area of the waistband.

22          So I think a reasonable officer seeing that activity

23  would take note as Deputy Lopez did, but that in and of

24  itself is not justification to shoot someone.

25     Q.    And then is it your understanding as Mr. Holland was

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

1   running away from Deputy Lopez, at some point he said, "I

2   will shoot you" or words to that effect?

3       A.   Yes, sir.  My understanding  is Mr. Holland's

4   comments were, "I will shoot" or "I will shoot you."

5       Q.   And when Mr. Holland was saying that initially

6   running southbound, do you think it would have been

7   appropriate for Deputy Lopez to shoot him at that time

8   without seeing any object in his hand or without him turning

9   towards him, just running away?

10      A.   No.  Given the facts of your hypothetical, it might

11  not have been appropriate at that time.  There are now --

12  there is felonious behavior.  So we left the arena of an

13  infraction.  We crossed over into an arena of misdemeanor

14  behavior, the 148, resisting, fleeing.

15          And now Mr. Holland has in my opinion escalated the

16  event with felonious behavior, direct assault or a direct

17  threat of an assault on a peace officer.  The totality of

18  that circumstance, Mr. G, in my opinion are concerning.  They

19  might not justify lethal force at that exact moment, but

20  based on the totality of the circumstances, Deputy Lopez or a

21  reasonably trained police officer would have concern at that

22  point.

23      Q.   But you would agree, I think we talked about this

24  earlier, concern for future harm may be very well supported,

25  but that doesn't necessarily rise to the level where you can

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 28

1   use deadly force?

2        A.   I would agree.

3        Q.   So at that point when he is running away, he says

4   "I'll shoot" or "I will shoot you," understanding the crimes

5   he committed, the 148 and now a threat of verbal threat on a

6   police officer, would you at least agree there that would not

7   yet justify the use of deadly force?

8             MS. ANDERSEN:  Objection.  Incomplete hypothetical;

9             You can answer.

10            THE WITNESS:  Given the fact pattern that you

11   offered, I would agree with limited fact pattern.  I thought

12   it interesting, Mr. G, that you injected the word "yet," and

13   I would agree it suggests that there is concern and suggests

14   that there is felonious behavior, and it suggests that the

15   officer, in this case Deputy Lopez, would be concerned and

16   stated as much for his safety, but yet not at the realm of

17   using deadly force.

18   BY MR. GALIPO:

19        Q.   Do you think it would have been appropriate or

20   unreasonable for Deputy Lopez at that point to stop a close

21   foot pursuit of Mr. Holland when Mr. Holland is saying "I

22   will shoot you" or words to that effect?

23            Would you have been critical of that?

24        A.   In this case, no.  And if I can explain.

25        Q.   Sure.

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 33

1    to his testimony, Deputy Lopez's testimony, he didn't see an

2    object either during that time frame?

3        A.    That's correct.  Only that Mr. Holland's hands were

4    continuously at his waistband.

5        Q.    And that during that time frame as they were going

6    southbound, Mr. Holland was generally running away from

7    Deputy Lopez, would you agree with that?

8        A.    I think through the entire chase Mr. Holland was

9    attempting to evade or escape.

10       Q.    And as Mr. Holland was running southbound before he

11   hit that dirt patch, would you agree it would have been

12   inappropriate for Deputy Lopez to shoot him?

13       A.    Yes.  I don't believe that there are enough

14   circumstances at that point, and I would add based on the

15   circumstance or based on the evidence that I reviewed,

16   clearly Deputy Lopez did not fire at that point.

17       Q.    So running away, obviously, would not be enough

18   under these facts to use deadly force, would you agree with

19   that?

20       A.    Yes.

21       Q.    And saying that -- just saying that you're going to

22   shoot someone, that would also not be enough under these

23   facts to use deadly force; it would have to be more than

24   that; is it a fair statement?

25       A.    Under the limited facts that we discussed, I think

A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Phillip L. Sanchez on 08/21/2024

Page 34

1    that's a fair statement.

2         Q.    Now, in the radio broadcast do you recall generally

3    what Deputy Lopez dispatched when he started in the foot

4    pursuit?

5         A.    Yes, sir.  I believe it was versed to the effect of

6    one running into the desert, something like that.

7         Q.    Was there any other dispatches you recall before the

8    shooting took place?

9         A.    No.  I don't believe so.

10        Q.    Any reference to Mr. Holland having a gun or

11   anything like that, that you recall before the shots fired

12   dispatch?

13        A.    I don't recall those radio broadcasts.

14        Q.    And I understand the concept of keeping someone in

15   sight, and I also understand from looking at photographs, I

16   did not go to the scene, but I can tell from looking at the

17   different photographs and even aerials of what you're

18   explaining as to the layout of that area.

19             But do you think -- would you have been critical of

20   Deputy Lopez if he backed off and created more distance, but

21   yet kept him in sight, still, after Mr. Holland is telling

22   him "I'm going to shoot you" or words to that effect?

23        A.    Not necessarily, Mr. G, and if I can explain.

24        Q.    Sure.

25        A.    We're talking about an event that occurred or at

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 38

```
 1      A.   Thank you.

 2      Q.   You're very welcome.   The last time that Mr. Holland

 3   said, "I will shoot you," would you agree he was still

 4   running away from Deputy Lopez?

 5      A.   Yes.

 6      Q.   And Deputy Lopez was still generally looking at his

 7   back at that point?

 8      A.   I believe Deputy Lopez testified that Mr. Holland

 9   has made the statement "I will shoot" almost simultaneously

10   as he's turning now to his left in a counterclockwise motion

11   while holding an object in his right hand at his waistband

12   when the shots were fired.   I will also say that I believe it

13   was Deputy Lopez's testimony and deposition that Mr.

14   Holland's, the speed of the chase had closed, not approaching

15   a stop which would be consistent with Mr. Holland's turning

16   movement and consistent with the autopsy report of the round

17   placements that struck, the rounds that struck Mr. Holland.

18      Q.   Would you agree based on your review up to the time

19   Mr. Holland turned and up to the time that Deputy Lopez saw

20   an object in his hand, so before that time, it would have

21   been inappropriate to use deadly force?

22      A.   Yes.   I think the linchpin here is in my estimation

23   that when -- I don't know his state of mind necessarily, but

24   Mr. Holland demonstrated ability, opportunity, and at least a

25   perceived intent when he turned towards or began to turn
```

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 42

1  Holland's hand prior to the shooting?

2      A.    The cite from the Department of Justice, Mr. G, and

3  if I can quote on Page 23 of my report, "At the moment when

4  shots were fired, Deputy Lopez could have reasonably believed

5  that Mr. Holland posed an imminent threat of death or serious

6  bodily injury.  The inference is that without the object and

7  the turning movement, there would be no rationale for the use

8  of deadly force."

9      Q.    And do you agree with that?

10     A.    With that statement that I just read?

11     Q.    Yes.  Do you agree that without the turning movement

12  and the object, there would be no justification to use deadly

13  force?

14     A.    Yes, sir.  And that's why Deputy Lopez had not fired

15  rounds during the foot pursuit prior to Mr. Holland either

16  slowing or stopping, turning to his left with an object in

17  his hand, in his right hand, and at his waistband.

18     Q.    So with respect to the Department of Justice report,

19  are you saying that you don't recall one way or the other

20  whether the turning movement is mentioned in there, or are

21  you saying you believe it is mentioned?

22     A.    May I reference the report again, sir?

23     Q.    Yes, you may.

24     A.    Thank you.  On Page 23 of my report referencing the

25  Department of Justice, part of their report, it says, "Mr.

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 43

1    Holland fled on foot from the traffic stop holding a black

2    cell phone rather than to stop or show his hands.  Deputy

3    Lopez chased Mr. Holland for one minute and 19 seconds over

4    846 feet.  Deputy Lopez ordered Mr. Holland to show his hands

5    19 times.  Instead of showing his hands, Mr. Holland told

6    Deputy Lopez, 'I'll shoot' or 'I'll shoot you' a total of ten

7    times.  Given such facts, the peace officer under these

8    circumstance could have reasonably believed that lethal force

9    was necessary to defend against an imminent threat of death

10   or serious bodily injury."

11          The report as I recall, did not necessarily call out

12   that Holland was turning.  However, the round strikes could

13   not have occurred, could not have impacted Mr. Holland's

14   torso and lower torso or lower legs if he had not completed

15   that movement.

16       Q.   The part where you read that he fled holding a black

17   cell phone in his hand, what was the source of that

18   information, if you know?

19       A.   Yes, sir.  That's a direct quote from the Department

20   of Justice report.

21       Q.   And do you know how they got that information,

22   whether it was from Deputy Lopez or somewhere else?

23       A.   I do not.  My assumption is it came from Deputy

24   Lopez.

25       Q.   Have you, I take it, you have reviewed other

A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Phillip L. Sanchez on 08/21/2024

Page 44

1    officer-involved shooting cases; you obviously told me that

2    earlier; correct?

3        A.   Yes, sir.

4        Q.   And you even had some officer-involved shooting

5    cases in your department when you were the chief?

6        A.   Yes.

7        Q.   And ultimately, you had to review some of those?

8        A.   All of them, yes, sir.

9        Q.   And it was customary in your department, I take it,

10   for the officers to give statements afterwards to give their

11   account for what happened?

12       A.   Customary might be an over-generalization.

13            There were times that officers provided statements

14   and over times following the advice of their attorney, they

15   did not provide an initial statement.  However, that does not

16   preclude the public safety requirement or a public safety

17   statement that is required of an officer to provide as soon

18   as reasonable and safe to do so.

19       Q.   And other officer-involved shooting cases that

20   you have reviewed, have you reviewed the officer statements

21   when those were available?

22       A.   Yes.

23       Q.   And do you know whether or not Deputy Lopez gave a

24   recorded interview in this case or a statement?

25       A.   Initially, he did not give a statement, at least not

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 45

1   to San Bernardino County investigators, and then subsequently

2   of course, I can't recall off the top of my head, but my

3   assumption is that he did, in fact, provide a statement at

4   some subsequent point.

5       Q.   Do you know who he provided that statement to?

6       A.   It's completely speculative, Mr. G, but if, in fact,

7   he did, it would have been to the Department of Justice, but

8   as I sit here right now, I vaguely recall -- I do recall the

9   night of the event he did not give a statement.

10      Q.   Have you reviewed his statement?  Not his

11  deposition, but his statement at any time to anybody as part

12  of the materials you had in this case?

13      A.   No, sir.  Just his deposition.

14      Q.   Now, you mentioned shortly before the break, and I

15  think again just a short while ago, the big factors here for

16  the deadly force would be the turning motion, the object in

17  his hand, coupled with his prior statements; is that fair?

18      A.   Prior threats, when you say prior statements, prior

19  threats?

20      Q.   Yes.  The prior threats.

21      A.   Yes, sir.

22      Q.   And I think you said something to the effect, well,

23  Mr. Holland could have just, you know, slowed down, for

24  example, as opposed to turning with the object in his hand?

25      A.   He could have stopped; he could have put his hands

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 46

1  up in the air; could have yelled or uttered I surrender, many

2  things to indicate to Deputy Lopez that, you know, I want

3  to -- I'll submit to custody.

4      **Q.   So if he had slowed down and stopped and not turned,**

5  **that might have been scenario what deadly force may not have**

6  **been necessary; is that fair?**

7          MS. ANDERSEN:  Objection.  Incomplete hypothetical;

8          You can answer.

9          THE WITNESS:  Based on the limited circumstanced,

10  Mr. G, that you provided in your hypothetical, it might not

11  be necessary to use force based on those limited

12  circumstances.

13  BY MR. GALIPO:

14      **Q.   And what, if hypothetically, again, my hypothetical,**

15  **Deputy Lopez did not see any object in Mr. Holland's hand**

16  **when he turned?  I realize that's different from his**

17  **deposition testimony.  It's just my hypothetical.**

18          **Would you then have a different opinion as to**

19  **whether the deadly force was appropriate?**

20          MS. ANDERSEN:  Objection.  Incomplete hypothetical;

21          You can answer.

22          THE WITNESS:  Based on the unlimited circumstances

23  that you provided, Mr. G, it's difficult to answer that

24  question.  What I know is this:  Is that despite the

25  felonious threats that Mr. Holland had made prior to the

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 49

1     A.   -- and I'm sorry to interrupt you.  It would --

2   specific to your hypothetical, it would have been based on

3   Deputy Lopez's ability to per perceive what Mr. Holland's

4   actions represented at the time he was turning without, in

5   your hypothetical, without an object in his hands.

6   BY MR. GALIPO:

7     Q.   Right.  But my hypothetical is, assume he saw that

8   his hands were visibly empty and perceived that.

9     A.   Okay.  I think you changed it a little bit.

10        The perception is important to me as an expert in

11  this case because now based on the limited circumstances of

12  your incomplete hypothetical, Deputy Lopez is perceiving that

13  there is nothing in his hands.  So it could be that Mr.

14  Holland in this hypothetical was turning to do something, but

15  without an object in his hands.

16    Q.   Then would you agree in that hypothetical it would

17  be inappropriate to use deadly force if Deputy Lopez

18  perceived he had nothing in his hands?

19        MS. ANDERSEN:  Objection.  Incomplete hypothetical.

20        You can answer.

21        THE WITNESS:  Yes.  It would be difficult to explain

22  why lethal force was used.

23  BY MR. GALIPO:

24    Q.   And my second hypothetical would be the same thing,

25  but this time Mr. Holland turns, and Deputy Lopez recognizes

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 51

1    in your report when you were citing a part of the Department

2    of Justice report about Mr. Holland running away from Deputy

3    Lopez southbound with his cell phone in his hand.

4            Do you recall that reference?

5    A.    Yes.

6    Q.    Now, I want to ask you a few questions about the

7    shots.  I think we talked briefly about it, and if you need

8    to turn to your report as to where the shots struck Mr.

9    Holland because I think you explained to me there were six

10   shots, and your understanding is four of them struck Mr.

11   Holland; is that right?

12   A.    Yes, sir.  Mr. G, may I reference my report?

13   Q.    Yes, you may.  And if you want to let us know if you

14   get to the page that you itemized that, that would be

15   helpful.

16   A.    Thank you, sir.  I'm looking at Page 21, Mr. G.

17   Q.    Okay.  Thank you.  So let me see if I can help take

18   us through this.

19           Do you have that one shot struck him in the left

20   chest; one the upper-left buttock; one the back of his left

21   thigh; and one the left top of his head?

22   A.    Yes, sir.

23   Q.    Would you agree, generally, that -- I realize you're

24   not a medical doctor or forensic pathologist, but having a

25   career in law enforcement and in reviewing many shooting

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 52

1  cases, would you agree that the left buttock would at least

2  have to be exposed to the gun to get struck in the left

3  buttock?

4      A.   Yes.  I think that -- yes, to answer your question,

5  and to add, I believe that the shots placement in this case

6  shows that all the rounds that hit Mr. Holland were generally

7  on the left side of his body which was consistent with Deputy

8  Lopez's deposition testimony about the actions of Mr.

9  Holland.

10     Q.   And then the shots to the back of the left thigh,

11  you would agree the back of the left thigh would have to be

12  exposed?

13     A.   Or turning to be exposed, yes, sir.

14     Q.   Did you ever consider that the initial shots may

15  have struck him in the buttocks and leg, and then he

16  turned?

17          MS. ANDERSEN:  I'm going to object to the extent

18  that exceeds his expert designation.

19          But you can answer.

20          THE WITNESS:  I don't recall in the autopsy report,

21  Mr. G, if the doctor opined on -- it would be very difficult,

22  if he opined on the shot sequence, which hit Mr. Holland

23  first and which hit Mr. Holland last.

24          So your incomplete hypothetical or your question

25  about is it possible, I suspect it is possible.

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 53

```
1    BY MR. GALIPO:
2        Q.    Okay.  Let me just ask a few other questions about
3    what occurred immediately after the shooting because one of
4    the things you mentioned was the public safety statement.
5            And do you have an understanding whether that was
6    given after the shooting?
7        A.    My understanding is that Sergeant Rios took a public
8    safety statement.
9        Q.    Was that recorded on the belt recorder?
10       A.    I don't know.
11       Q.    Do you know if there was any mention in this public
12   safety statement about an object in his hand or Mr. Holland
13   turning to his left?
14           MS. ANDERSEN:  Objection to the extent it calls for
15   speculation.
16           But you can answer.
17           THE WITNESS:  I don't know that that would
18   necessarily be included in the public safety statement
19   obtained by Sergeant Rios.  However, I do recall in his
20   deposition testimony Deputy Lopez told Deputy Hillebrand that
21   he was turning towards me; he was going to -- he said, "I'm
22   going to shoot you."
23   BY MR. GALIPO:
24       Q.    Okay.  And is it your understanding that after the
25   shooting Deputy Lopez alerted dispatch that shots had been
```

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 54

1    fired?

2        A.    That was my recollection.

3        Q.    And did you ever hear Deputy Lopez on the radio

4    dispatch before or after the shots indicate that he believed

5    Mr. Holland had a firearm?

6        A.    I don't recall that radio broadcast.

7        Q.    And you understand Deputy Hillebrand arrived less

8    than 90 seconds after the shooting?

9        A.    Yes.  Approximately 90 seconds, yes, sir.

10       Q.    And do you recall Deputy Hillebrand asking Deputy

11   Lopez, "Where is the gun, did he have a gun?"

12       A.    Yes, I believe there was -- there were two questions

13   that Deputy Hillebrand asked.  The first question was, "Are

14   you okay."  And Deputy Lopez responded that he was.

15           I believe Deputy Hillebrand also testified that in

16   his deposition when he arrived, Deputy Lopez was still

17   providing cover.  So maybe he was still pointing his firearm

18   towards Mr. Holland.

19           The second question then Deputy Hillebrand asked is,

20   "Where is the gun," and I believe Deputy Lopez responded, "I

21   don't know.  "He threatened --" or "He said he was going to

22   shoot me."

23           My assessment of that statement, Mr. G, simply is,

24   that Deputy Lopez was not -- was not making the affirmative

25   statement, I don't know where the gun is or -- I'm sorry -- I

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 55

1    don't know if he would had a gun.  I think Deputy Lopez was

2    trying to communicate to Deputy Hillebrand, I don't know

3    where the gun landed after the shooting; I don't know where

4    it is.

5        Q.    Do you recall Deputy Hillebrand asking Deputy Lopez,

6    "Did he have a gun?"

7        A.    I recall the question was, "Where is the gun."

8        Q.    And again, I'm looking at a portion of the DOJ

9    report, and at least here, it says that Hillebrand asked,

10   "Where is the gun, did he have a gun" kind of both of them.

11       A.    Okay.

12       Q.    And then Lopez replied, "I don't know.  He said he's

13   going to shoot me."

14             Do you generally recall that?

15       A.    Yes, sir.  That sounds accurate.

16       Q.    Based on your review of the materials and listening

17   to the audio of the belt recordings, did Deputy Lopez ever

18   tell the arriving officers, "Be careful, he has a gun on

19   him," or words to that effect?

20       A.    No.

21       Q.    And did you ever hear anywhere on the belt recording

22   of Deputy Lopez him telling anyone when they arrived at the

23   scene that Mr. Holland had turned towards him?

24       A.    I don't recall that specific narrative offered by

25   Deputy Lopez.  I believe he did testify to that in his

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 56

1    deposition.  There were only two officers that initially

2    arrived after the shooting.  That would have been Deputy

3    Hillebrand -- excuse me -- and Sergeant Rios.

4        Q.   And is it your understanding there was a cell phone

5    recovered?

6        A.   Yes, sir, recovered by Mr. Holland's body.

7        Q.   Do you have a general understanding as to where the

8    cell phone was recovered in relation to Mr. Holland's body?

9        A.   There were to statements, actually, with respect to

10   the location.  Deputy Hillebrand thought it was near his

11   mid-torso leg area.  And I think Sergeant Rios believed that

12   it was actually at his head area.

13            But the fact it's not in dispute, is that at least

14   in my opinion is that a cell phone was recovered at the

15   scene.

16       Q.   Did the officers based on your review, recognize it

17   as a cell phone when they recovered it?

18       A.   That's my understanding.  It's how it was listed in

19   the body of the material provided to me.

20       Q.   Have you been provided photos of the cell phone as

21   part of the documents you reviewed?

22       A.   I believe there were photos in the crime scene

23   photographs, yes.

24       Q.   In some of the cases you've worked on as an expert

25   and maybe reviewed during your law enforcement career, have

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 57

1    you noted that sometimes there's disputed facts?

2        A.   Yes.

3        Q.   Okay.  It's not uncommon, is it, where there is

4    disputes as to some of the facts of a case?

5        A.   Yes, sir.  It's not too uncommon.

6        Q.   And is it your general understanding as an expert

7    witness when there is disputed facts, that the jury

8    ultimately decides those disputed facts?

9             MS. ANDERSEN:  I'm just going to object to the

10   extent it calls for a legal conclusion.

11            But, of course, you can answer.

12            THE WITNESS:  Yes, sir.  I don't know that my

13   opinion carries any more weight than another experts'

14   opinions.  Ultimately, the jury will decide which they

15   believe to be accurate.

16   BY MR. GALIPO:

17       Q.   Okay.  And obviously, whether the use of force was

18   excessive or not, you understand that's ultimately a jury

19   decision as well?

20       A.   Yes, sir.

21       Q.   I take it in many of the cases where you've been an

22   expert for one side, there is also been an expert retained on

23   the other side?

24       A.   Yes, sir.

25       Q.   And has it been uncommon in your experience for the

**A.H. and H.H., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Phillip L. Sanchez on 08/21/2024**

Page 60

```
 1                        CERTIFICATE

 2                            OF

 3           CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5           I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8           That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10           That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12           That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15           Further, that the foregoing is an accurate

16   transcription thereof.

17           I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21           IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  August 21, 2024.

23           _____

24           Jinna Grace Kim, CSR No. 14151

25
```